STATE OF CONNECTICUT *v.* JOSEPH PAOLELLA
(13445)

PETERS, C. J., SHEA, CALLAHAN, GLASS and HULL, Js.

Argued April 5—decision released June 27, 1989

*Temmy Ann Pieszak,* assistant public defender, for the appellant (defendant).

*Judith Rossi,* assistant state's attorney, with whom, on the brief, was *Michael Dearington,* state's attorney, for the appellee (state).

CALLAHAN, J. The defendant, Joseph Paolella, was convicted after a trial to the court[1] of kidnapping in the second degree with a firearm in violation of General Statutes § 53a-94a[2] and assault in the third degree

---

[1] The defendant waived his right to a trial by jury.

[2] "[General Statutes] Sec. 53a-94a. KIDNAPPING IN THE SECOND DEGREE WITH A FIREARM: CLASS B FELONY: ONE YEAR NOT SUSPENDABLE. (a) A person is guilty of kidnapping in the second degree with a firearm when he kidnaps in the second degree, as provided in section 53a-94, and in the commission of such offense he uses or is armed with and threatens the use of or uses or displays or represents by his words or conduct that he possesses a pistol, revolver, machine gun, shotgun, rifle or other firearm. No person shall be convicted of kidnapping in the second degree and kidnapping in the second degree with a firearm upon the same transaction but such person may be charged and prosecuted for both such offenses upon the same information.

"(b) Kidnapping in the second degree with a firearm is a class B felony for which one year of the sentence imposed may not be suspended or reduced by the court."

"[General Statutes] Sec. 53a-94. KIDNAPPING IN THE SECOND DEGREE: CLASS B FELONY. (a) A person is guilty of kidnapping in the second degree when he abducts another person."

"(b) Kidnapping in the second degree is a class B felony."

The defendant was originally charged with kidnapping in the first degree, in violation of General Statutes § 53a-92, and kidnapping in the first degree with a firearm, in violation of General Statutes § 53a-92a. At the close of all the evidence, the trial court found the defendant not guilty of kidnapping in the first degree, but convicted him on the lesser included offense of kidnapping in the second degree with a firearm, in violation of § 53a-94a.

in violation of General Statutes § 53a-61 (a) (1).[3] The trial court sentenced the defendant to fifteen years imprisonment on the kidnapping charge, suspended after eight years and five years probation. The defendant was also sentenced to one year on the assault charge to run concurrently with the kidnapping sentence. On appeal, the defendant claims that there was insufficient evidence to support a conviction of kidnapping in the second degree with a firearm. He also argues that the trial court erred when it: (1) exempted the complaining witness from its sequestration order thereby denying him his constitutional right to a fair trial; and (2) concluded that his eight year old son had been given an oath and was competent to testify, thereby denying him due process and his right to a fair trial. We find no error.

The facts found by the trial court are as follows. The defendant and the complainant were married in May, 1978. Three children were born to them during their marriage. In April, 1986, the couple agreed to be

___

[3] General Statutes § 53a-61 (a) provides: "ASSAULT IN THE THIRD DEGREE: CLASS A MISDEMEANOR. (a) A person is guilty of assault in the third degree when: (1) With intent to cause physical injury to another person, he causes such injury to such person or to a third person; or (2) he recklessly causes serious physical injury to another person; or (3) with criminal negligence, he causes physical injury to another person by means of a deadly weapon, a dangerous instrument or an electronic defense weapon."

In addition to assault in the third degree and the kidnapping charges, the substitute information also charged the defendant with sexual assault in the first degree, in violation of General Statutes § 53a-70; sexual assault in the first degree with a deadly weapon, in violation of General Statutes § 53a-70a; and carrying a deadly weapon, in violation of General Statutes § 53-206. At the close of the state's case the trial court granted the defendant's motion for judgment of acquittal on the sexual assault counts and on the carrying a dangerous weapon charge, and subsequently dismissed those charges. The state appealed from the court's dismissal of the sexual assault counts, and in *State* v. *Paolella,* 210 Conn. 110, 554 A. 2d 110 (1989), we dismissed the appeal holding that principles of double jeopardy barred our consideration of it. The sexual assault charges and the weapons charge are not in question in the present appeal.

divorced because of marital difficulties. During that same month, the complainant moved herself, her children, and a niece who had been living with the family, out of the couple's marital home in North Haven. Shortly thereafter, the defendant filed a divorce action, notice of which was served on the complainant while she was staying with a friend in Meriden.

After a few weeks, the complainant moved back into the marital home based on her belief that the defendant would move out. At this time the defendant expressed his desire to drop the divorce action. The complainant, still desiring to terminate the marriage, filed a cross complaint for divorce. After the defendant refused to leave the marital home, the complainant left again, this time taking the children to a battered women's shelter in New London. In May, 1986, the complainant obtained several restraining orders against the defendant prohibiting him, inter alia, from entering the marital home. Thereafter, when the defendant moved out, she moved back in with the children.

On May 24, 1986, the complainant allowed the defendant to stay at the house with the children while she went out for the night with her boyfriend. When she returned home the following day, the defendant left the house amicably. Shortly thereafter, however, he returned carrying a rifle and forced his way inside. When the complainant ordered him to leave, the defendant forced their son, J, out of the house and into the garage. The complainant tried to call her boyfriend, but was unable to do so because the defendant had disconnected the phone. She then went and retrieved J from the garage, whereupon the defendant followed her into the house and the two engaged in a loud argument. During the course of the argument, the complainant tried to escape from the house through both the doors and windows; however, the defendant forcibly prevented her from doing so. When she attempted

to use the phone again, the defendant hit her with it. Still holding his rifle, the defendant then grabbed the complainant, hit her, and pushed her against a wall with such force that her head and heel went through the wall. J, who had been observing the fight between his parents, attempted to take the rifle away from his father and stop the fight; the defendant, however, retained control of the weapon and ordered the child to go upstairs.

Carrying the rifle, the defendant dragged the complainant by her hair down the stairs to the basement, where he pointed the rifle at her head and threatened to kill her. He then tied her wrists and legs to his weightlifting bench with a telephone cord while he berated her and called her names. When the defendant began to fondle her breasts, the complainant yelled, at which point the defendant gagged her with a sock. After a struggle, the complainant was able to loosen the bonds around her wrists, only to have the defendant tighten them again. The defendant then untied the complainant's legs, removed her pants, retied her legs above her head to the bar over the weight bench, and had sexual intercourse with her. During this incident, J had crept downstairs into the basement. Although he did not see his father sexually assaulting his mother, he did see her tied to the bench, half-naked, crying, with a gag in her mouth.

After further berating the complainant, the defendant untied her, removed her gag, and dressed her. The defendant then told the complainant that he would go to a local mental health center to avoid going to jail for his actions. Carrying his rifle, the defendant took the complainant by the arm, back up the stairs and ordered her to sit at the kitchen table, where she eventually fell asleep. The complainant awoke the next morning at the kitchen table to find the defendant sitting across from her still holding the rifle. Immediately

after she awoke the defendant began arguing with the complainant and when she attempted to escape from the house he pushed her to the floor. The complainant, while on the floor, yelled to her five year old daughter to run to a neighbor's house and tell the neighbor that "her Daddy [was] hitting [her Mom]." The daughter apparently went to the neighbor's house, but, finding no one there, she returned home. Later in the morning, the defendant sent J to the store for cigarettes while he held the rest of the family at gunpoint in the corner of the living room. The defendant told the boy that "if he said anything [while he was at the store about what was going on at the house, the defendant] would shoot [his mother]."

Eventually the defendant repaired the telephone and called his mother to ask her to come and get the children. While the children were getting into their grandmother's car, the defendant forced the complainant at gunpoint into her own car, which he then drove to the parking lot of the Connecticut Mental Health Center where he freed her. Upon her release, the complainant went to the emergency room of a nearby hospital where she told medical personnel that she had been raped by the defendant. An examination of the complainant revealed multiple injuries, including bilateral circumferential abrasions on her wrists and ankles, and fresh bruises on her head, legs and right hip. The defendant surrendered himself at the mental health center and was later taken into custody by the police.

On appeal, the defendant argues that the trial court's judgment of guilty of kidnapping in the second degree with a firearm, in violation of § 53a-94a, was error because the evidence presented by the state at trial did not demonstrate that the complainant was "abducted" as is required by that statute. He claims that at best the evidence supports a conviction of the lesser offense

of unlawful restraint, in violation of § 53a-96,[4] which merely requires the state to prove that he "restrained" the complainant.[5]

"Abduct" and "restrain" are defined in General Statutes § 53a-91. Section 53a-91 (1) states, in relevant part, that " '[r]estrain' means to restrict a person's movements intentionally and unlawfully in such a manner as to interfere substantially with his liberty by moving him from one place to another, or by confining him either in the place where restriction commences or in a place to which he has been moved, without consent." "Abduct" is defined in § 53a-91 (2) as "restrain[ing] a person with intent to prevent his liberation by either (a) secreting or holding him in a place where he is not likely to be found, or (b) using or threatening to use physical force or intimidation." Relying on the definition of restraint in § 53a-91a (1) which reads "interfere substantially with his liberty," the defendant claims that one can be found to have restrained another person if he prevents that person from *freeing himself*. Because the definition of abduction in § 53a-91 (2) requires in addition that the accused "prevent [the victim's] liberation," the defendant claims that one can be found to abduct another person only if he prevents third parties from *rescuing* the victim. Accordingly, the defendant contends that in order for the court to conclude that he abducted the complainant and thereby find him guilty of kidnapping under § 53a-94a, it was necessary for the state to prove beyond a reasonable

[4] "[General Statutes] Sec. 53a-96. UNLAWFUL RESTRAINT IN THE SECOND DEGREE: CLASS A MISDEMEANOR: (a) A person is guilty of unlawful restraint in the second degree when he restrains another person.

"(b) Unlawful restraint in the second degree is a class A misdemeanor."

[5] The state maintains that this issue was not raised in the trial court and, therefore, is not reviewable on appeal. We will address it, however, because the record is complete and the question is essentially one of law. *Cochran* v. *McLaughlin,* 128 Conn. 638, 644, 24 A.2d 836 (1942).

doubt that he intended to prevent both the complainant's self-liberation *and* her liberation by third parties.

Even if we were to adopt the defendant's somewhat strained interpretation of the definition of "abduct," we conclude that the evidence on the record reveals that the defendant intended both to restrain the complainant and to prevent her liberation by outside forces and, therefore, his conviction of kidnapping in the second degree with a firearm in violation of § 53a-94a was not error. According to the testimony at trial, the defendant intended to prevent the complainant from freeing herself when he repeatedly stopped her from leaving the house when she attempted to do so; tied her up, so that she could not escape, prior to sexually assaulting her; and held her at gunpoint on several occasions and threatened to kill her. The evidence shows further that the defendant prevented the complainant's liberation by third parties when he disconnected the telephone, thereby obviating the possibility of incoming and outgoing calls; prevented the complainant from screaming out the window for help from neighbors; told the complainant that he would kill her if the police arrived; stated that he knew the complainant would report him to the police so he "would have to tie [her] up"; told the complainant, after tying her up and sexually assaulting her, that he intended to leave her tied up until he went "far enough away"; gagged the complainant to keep her from yelling for help while he sexually assaulted her; and told J, when he sent him for cigarettes at a nearby store, not to say anything to anyone about what was going on at home or he would shoot the boy's mother. The evidence being clear that the defendant "abducted" as well as "restrained" the complainant, his conviction by the trial court, under § 53a-94a, was not error.

We next address the defendant's claim that he was denied a fair trial by the action of the trial court in violating its own sequestration order. At the commencement of the trial, the defendant motioned the court for the sequestration of witnesses. The state did not object and the court granted the motion. After the complainant had testified as a state's witness, the state called her daughter, S, to the stand to testify as to what she had witnessed in May, 1986. Before the state began its direct examination of S, however, the defendant objected to the presence of the complainant in the courtroom, arguing that although the complainant had already testified, the sequestration order prohibited her from being in the courtroom during her daughter's testimony. A similar objection was made to the complainant's presence during J's testimony. The state, pointing out that S was only six years old and that J was only eight, requested that the complainant be exempted from the order during their testimony as the event was likely to be an upsetting experience for the children. The trial court ruled that the complainant could remain in the courtroom during the children's testimony because she had already testified and, therefore, her exclusion was not warranted to fulfill the purposes of its sequestration ruling. The court also stated that her presence was necessary to provide the children with "somebody [whom] they have been living with regularly . . . in the courtroom for whatever comfort that [it would] give [them]."

Practice Book § 876, which governs the sequestration of witnesses, states that "[t]he judicial authority upon motion of the prosecuting authority or of the defendant shall cause any witness to be sequestered during the hearing on any issue or motion or during any part of the trial in which he is not testifying." See also General Statutes § 54-85a. "The purpose of a sequestration order is to prevent a witness from

fashioning his testimony to correspond to the statements of others in the courtroom"; *State* v. *Stovall,* 199 Conn. 62, 67, 505 A.2d 708 (1986); *Geders* v. *United States,* 425 U.S. 80, 87, 96 S. Ct. 1330, 47 L. Ed. 2d 592 (1976); *State* v. *Williams,* 169 Conn. 322, 331, 363 A.2d 72 (1975); *State* v. *Pikul,* 150 Conn. 195, 200, 187 A.2d 442 (1962); C. Tait & J. LaPlante, Handbook of Connecticut Evidence (2d Ed. 1988) § 7.29; thereby ensuring that a defendant receives a fair trial. If the trial court fails to observe its own sequestration order, the burden is on the party requesting sequestration to show prejudice. *State* v. *Stovall,* supra, 69; *State* v. *Silveira,* 198 Conn. 454, 479, 503 A.2d 599 (1986); *State* v. *Brown,* 187 Conn. 602, 611, 447 A.2d 734 (1982); *State* v. *Ruth,* 181 Conn. 187, 196–97, 435 A.2d 3 (1980).

Although § 876 is not discretionary and the complainant, as a witness, technically should have been sequestered, we conclude that the trial court did not commit reversible error in exempting her from its order and thereby allowing her to remain in the courtroom while the children were testifying. Our holding is based on the fact that, at the time the children took the stand, the complainant had already testified and, therefore, she was unable to tailor her testimony to correspond to that of her children. Since the purpose of the sequestration order was not undermined by the complainant's presence in the courtroom during the children's testimony,[6] the trial court's decision to exempt her from its order was not in any way prejudicial to the defendant in that regard.

---

[6] The trial court, in excluding the complainant from the sequestration order and allowing her to remain in the courtroom while her children were on the stand, stated: "[A]s I read [§ 54-85a] and [§ 876 of] the Practice Book . . . with respect to sequestration of witnesses . . . the purpose is to prevent a witness from sitting in, listening to prior witnesses testify and then tailoring his or her testimony to fit in with the version the earlier witness has given. Now this lady has testified she is finished. So obviously she can't tailor her testimony to fit with anything these two children would

We must next determine whether the complainant's presence in the courtroom as a spectator[7] violated the defendant's right to a fair trial. The defendant maintains that the trial court erred when it allowed the complainant to be in the courtroom during her children's testimony as her presence allegedly inhibited them from testifying with total candor.[8]

say." Although the complainant was not called back onto the stand for rebuttal testimony, the trial court noted that "if she should attempt to tailor her testimony to fit with different testimony given by either of the two children [on rebuttal], I think this Court is in a position to notice that and evaluate her testimony across the board accordingly. This isn't a jury case. It is a court case. . . ."

[7] The defendant relies on the fact that the complainant was a witness subject to a sequestration order. He argues that the purpose of a sequestration order is broader then merely preventing one witness from tailoring his testimony to that of another witness in that it is generally meant to provide for the removal of all witnesses from a courtroom where they will influence the witness testifying. Based on this contention, the defendant maintains that the complainant should not have been permitted to remain in the courtroom during the children's testimony. We decline to adopt the defendant's broad view of the purpose of a sequestration order and conclude that, on the present facts, where a sequestration order existed and a witness who has testified sought to remain in a courtroom, the witness' status changed to that of a spectator and his presence was governed by principles of due process discussed, infra.

[8] The defendant also attempts to characterize this issue as a violation of his state and federal constitutional rights to confrontation. He maintains that the complainant's presence in the courtroom somehow "diluted" his ability to confront S and J. We reject this claim as the confrontation clause involves the defendant's face-to-face contact with witnesses who are testifying and does not involve the presence of third parties. The defendant in this case was in the courtroom and had a full view of the children while they were testifying. He also had an opportunity to cross-examine the children without limitation. Accordingly, the defendant's confrontation rights were fully protected. *State* v. *Jarzbek,* 204 Conn. 683, 529 A.2d 1245 (1987), cert. denied, U.S. , 108 S. Ct. 1017, 98 L. Ed. 2d 932 (1988).

It is curious that the defendant makes a confrontation clause claim on appeal when he suggested to the trial court that both he and the complainant leave the courtroom while the children testified. The right of face-to-face confrontation is waived if the defendant is voluntarily absent from the courtroom. *Taylor* v. *United States,* 414 U.S. 17, 19–20, 94 S. Ct. 194, 38 L. Ed. 2d 174 (1973).

The trial court has the authority " 'to exclude spectators [from the courtroom] whose presence intimidates the witness [testifying].' *Commonwealth* v. *Bohmer,* [374 Mass. 368, 380, 372 N.E.2d 1381 (1978)]. See *United States ex rel. Orlando* v. *Fay,* 350 F.2d 967, 971 (2d Cir. 1965), cert. denied sub nom. *Orlando* v. *Follette,* [384 U.S. 1008, 86 S. Ct. 1961, 16 L. Ed. 2d 1021 (1966)] . . . *United States ex rel. Laws* v. *Yeager,* 448 F.2d 74, 81 (3d Cir. 1971), cert. denied. [405 U.S. 976, 92 S. Ct. 1201, 31 L. Ed. 2d 251 (1972)] . . . . " *Commonwealth* v. *Stetson,* 384 Mass. 545, 550, 472 N.E.2d 926 (1981); cf. *State* v. *Sheppard,* 182 Conn. 412, 416, 438 A.2d 125 (1980) (trial court may exclude spectators to "foster full and truthful testimony"). Excluding spectators, however, is a matter that is within the *discretion* of the trial court; *United States ex rel. Bruno* v. *Herold,* 408 F.2d 125, 127 (2d Cir. 1969); see Practice Book § 895 (trial court *"may,* when constitutionally permissible, order that the public . . . be excluded from any portion of a proceeding when there is a substantial likelihood that the presence of the public . . . would unduly inhibit any testimony, or endanger the safety of any witness, or interfere with the defendant's right to a fair trial . . ." [emphasis added]); and the court's decision one way or the other will not be disturbed on appeal unless the court has abused its discretion. *State* v. *Woolcock,* 201 Conn. 605, 618, 518 A.2d 1377 (1986) (trial court's decision to allow uniformed state troopers to be present at trial was not an abuse of discretion). On the present record, we conclude that the trial court did not abuse its discretion by allowing the complainant to remain in the courtroom while her children were testifying.

After ruling that the complainant could remain in the courtroom during S's testimony, the trial court noted that it would watch to see if she were influencing S's testimony, stating: "I assure you [the complainant] will

be in full view of this Court and I am sure that [the state's attorney] will advise her that she is to do nothing by any motions, signs, whatever or however sometimes people in the audience frequently do to attempt to influence anything these children are saying." The defendant points to no evidence that the complainant attempted to influence S's testimony, and, in fact, the trial court stated after she had finished testifying that "the child never even looked in her mother's direction as far as I could see and the mother did nothing, absolutely showed no reaction of any type to any respect of that child's testimony." Because the complainant had not influenced S's testimony, the court ruled that she could remain in the courtroom while J was testifying. As with S's testimony, there is nothing in the record to indicate that the complainant influenced J's testimony. Although the complainant was present when J testified, his version of the incident in question was not totally favorable to her as he indicated that he was upset that the complainant was going to call the police on the defendant. Further, while there is evidence that J looked at his mother during cross-examination when he was being questioned about his attempt to write a note to the police, the defendant later took the stand and verified that the boy had written such a note. The fact that J looked at his mother while he was testifying about this incident, therefore, is no indication that she influenced him to falsify his testimony. Moreover, immediately after J looked at the complainant, the trial court reprimanded him. After that incident the defendant made no other objections claiming that J was looking at the complainant or that the complainant was attempting to influence him in any way.

Despite the lack of evidence that the complainant influenced S's or J's testimony at trial, the defendant argues that, as the custodial parent, her presence had an indirect inhibiting effect on the children. Accord-

ing to the defendant, the children colored their testimony to favor the complainant because they were fearful that if she heard them support the defendant they would be punished when they got home. The defendant, however, failed to articulate any such claim in the trial court. Further, the record fails to support such a claim as the defendant did not question the children during their competency examinations or during cross-examination, about their relationship with the complainant or ask whether she had persuaded them to lie about the incident or had influenced them in any way. Moreover, while the defendant suggested to the court that he would rather have a guardian appointed to sit in during the children's testimony or have both himself and the complainant removed from the courtroom as alternatives to the complainant remaining in the courtroom, he never requested an evidentiary hearing or a voir dire of the children concerning any possible influence the presence of their mother might have on them. Accordingly, the record provided to us by the defendant is inadequate to support this claim. See *State v. Woolcock*, supra.

The defendant's final contention is that J's testimony should not have been used against him because it was not given under oath, as provided by General Statutes § 1-25,[9] and even if it had been, the court erred in finding him competent to testify. Stating that J's testimony was essential to corroborate that of the complainant's, the defendant maintains that he is entitled to a new trial.

---

[9] General Statutes § 1-25 provides in pertinent part: "FORMS OF OATHS. The forms of oaths shall be as follows, to wit:

\* \* \*

"FOR WITNESSES.

"You solemnly swear that the evidence you shall give, concerning the case now in question, shall be the truth, the whole truth and nothing but the truth; so help you God."

Prior to J's testimony, the following colloquy took place:

"The court: [J], [the clerk] wants you to stand up and put your hand up in the air like that. You listen to what he says. He is going to ask you, are you going to tell the truth, and [if] you are going to tell the truth, you should say, yes. All right, do you understand?

"The Witness: Yes.

"The Court: All right, go ahead.

"The Clerk: You solemnly swear that the evidence you shall give concerning the case now in question shall be the truth, the whole truth and nothing but the truth so help you God?

"The Witness: Do I say it?

"The Court: If you are going to tell the truth when you answer these questions.

"The Witness: I am.

"The Court: You are going to tell the truth?

"The Witness: Yes.

"The Court: Thank you, [J], you can sit down."

The above cited colloquy makes clear that J was under oath when he testified. The administration of an oath need not be formal in nature. See General Statutes § 1-22; *State* v. *Spigarolo,* 210 Conn. 359, 393, 556 A.2d 112 (1989). As long as the witness "signifies the undertaking of an obligation 'to speak the truth at a time when . . . testimony may deeply affect the rights and the character of individuals'; *Chapman* v. *Gillet,* 2 Conn. 40, 44 [1816]"; *State* v. *Grant,* 176 Conn. 17, 24, 404 A.2d 873 (1978); he will be deemed to be under oath. In the present case, J made a "solemn commit-

ment [to] speak the truth"; *State* v. *Zamorsky,* 159 N.J. Super. 273, 283, 387 A.2d 1227 (1978); and, therefore, we are satisfied that he was duly sworn.

Even if we were to find that no oath had been administered, we note that the defendant failed to object to J's testimony on these grounds at trial. In *Bassett* v. *Mechanics Bank of New Haven,* 116 Conn. 730, 166 A. 385 (1933), we concluded that where the defendants had failed to object at trial to the testimony of a witness who had not been sworn they could not raise the issue on appeal. In so holding, we stated, "counsel must have known [that unsworn testimony was being received by the court] and if they wished to raise any objection based upon it they should have called it to the attention of the trial court at the time, when any defect of this nature could have been remedied; not having done so they waived any such defect. *Cady* v. *Norton,* 31 Mass. (14 Pick.) 236 [1833] [in absence of waiver rule counsel might deliberately avoid objecting to a witness being unsworn in order to have a ground of appeal]; *People ex rel. Niebuhr* v. *McAdoo,* 184 N.Y. 304, 317, 77 N.E. 260 [1906]; *Slauter* v. *Whitelock,* 12 Ind. 338, 340 [1859]; *State* v. *Hope,* 100 Mo. 347, 355, 13 S.W. 490 [1890]; *Moore* v. *State,* 96 Tenn. 209, 33 S.W. 1046 [1896]; 3 Wigmore, Evidence (2d Ed.) § 1819 (b)." Id., 730–31; cf. *State* v. *Spigarolo,* supra; *State* v. *Miller,* 202 Conn. 463, 469, 522 A.2d 249 (1987) (the irregular administration of an oath must be objected to at trial in order to present the issue on appeal). The rule enunciated in *Bassett* v. *Mechanics Bank,* supra, is considered the general rule. See, e.g., *United States* v. *Odom,* 736 F.2d 104, 114–16 (4th Cir. 1984); *United States* v. *Perez,* 651 F.2d 268, 273 (5th Cir. 1981) ("It has long been the general rule that even a failure to swear a witness may be waived. This may occur either by knowing silence and an attempt to raise objection after verdict or by the mere failure of counsel to notice the

omission before completion of the trial"); *Wilcoxon* v. *United States,* 231 F.2d 384, 386–87 (10th Cir.), cert. denied, 351 U.S. 943, 76 S. Ct. 834, 100 L. Ed. 1469 (1956); *Saxton* v. *State,* 389 So. 2d 541, 543 (Ala. Crim. App. 1980); *State* v. *Navarro,* 132 Ariz. 340, 342, 645 P.2d 1254 (1982); *Sewall* v. *Spinney Creek Oyster Co.,* 421 A.2d 36, 39 (Me. 1980); *State* v. *Embrey,* 62 N.M. 107, 109, 305 P.2d 723 (1957); *Brown* v. *Ristich,* 36 N.Y.2d 183, 189, 325 N.E.2d 533, 366 N.Y.S.2d 116 (1975); *State ex rel. Tucker* v. *Alvis,* 55 Ohio L. Abs. 285, 286, 89 N.E.2d 328 (1949); *Thomas* v. *Dad's Root Beer, Etc.,* 225 Or. 166, 357 P.2d 418 (1960); *Bowling Club* v. *Toronto,* 17 Utah 2d 5, 8, 403 P.2d 651 (1965); *In re Simmons Children,* 154 W. Va. 491, 496, 177 S.E.2d 19 (1970); 58 Am. Jur. 2d, New Trial § 35; 81 Am. Jur. 2d, Witnesses § 414. Accordingly, by failing to object to J's allegedly unsworn testimony at trial, the defendant has waived his right to raise the issue on appeal.[10]

In addressing the defendant's claim that the trial court erred in finding J competent to testify, we note that "[t]he testimonial capacity of a child witness is a matter for the court to determine upon inquiry. *State* v. *Segerberg,* 131 Conn. 546, 547, 41 A.2d 101 (1945). In Connecticut, the examination to determine the competency of a witness is usually conducted by counsel under direction of the court, except insofar as the court may find it advisable to intervene. See *State* v. *Orlando,* 115 Conn. 672, 676, 163 A. 256 (1932). Because the

---

[10] The defendant claims that review is warranted under *State* v. *Evans,* 165 Conn. 61, 70, 327 A.2d 576 (1973), as the admission of unsworn testimony "deprived [him] of a fundamental constitutional right and a fair trial." It is well settled, however, that no constitutional provision is violated when unsworn testimony is received. *Broadhead* v. *Arizona Board of Pardons,* 151 Ariz. 37, 41, 725 P.2d 744 (1986); *State* v. *Doud,* 190 Or. 218, 236, 225 P.2d 400 (1950); 81 Am. Jur. 2d, Witnesses § 44; cf. *State* v. *Lizzi,* 199 Conn. 453, 462, 508 A.2d 11 (1986) (no constitutional violation in the admission of inadmissible hearsay without exception).

competency of a witness is a matter peculiarly within the discretion of the trial court, its ruling will be disturbed only in a clear case of abuse or some error in law. *State* v. *Siberon,* 166 Conn. 455, 457, 352 A.2d 285 (1974); *State* v. *Orlando,* supra, 675; *Kuczon* v. *Tomkievicz,* 100 Conn. 560, 572–73, 124 A. 226 (1924)." *State* v. *Rodriguez,* 180 Conn. 382, 388–89, 429 A.2d 919 (1980); *State* v. *Valeriano,* 191 Conn. 659, 665, 468 A.2d 936 (1983) cert. denied, 466 U.S. 974, 104 S. Ct. 2351, 80 L. Ed. 2d 824 (1984); *State* v. *Manning,* 162 Conn. 112, 115, 291 A.2d 750 (1971); C. Tait & J. LaPlante, supra, §§ 7.1, 7.2. The considerations that should govern the determination of competency, whether the witness is an adult or a child, are " 'the proposed witness' maturity to receive correct impressions by his senses, ability to recollect and narrate intelligently, and ability to appreciate the moral duty to tell the truth. *State* v. *Segerberg,* [supra, 547]; *Kuczon* v. *Tomkievicz,* [supra, 570].' *State* v. *Manning,* [supra]; see McCormick, Evidence (2d. Ed.) § 62; cf. note, 81 A.L.R.2d 386." *State* v. *Siberon,* supra, 458. " ' "[J]udicial determination[s] of the question of whether a witness should be heard at all [however,] should be abrogated in favor of hearing the testimony for what it is worth." ' " *State* v. *James,* 211 Conn. 555, 564, 560 A.2d 426 (1989). Reviewing the record as a whole, we conclude that the trial court did not abuse its discretion in finding that J was competent to testify.

There is no error.

In this opinion the other justices concurred.