## STATE OF CONNECTICUT *v.* SHAWN ROBINSON
## (14846)

PETERS, C. J., CALLAHAN, BORDEN, BERDON and NORCOTT, Js.

Argued May 10—decision released August 9, 1994

*Rita M. Shair,* assistant state's attorney, with whom were *Michael Dearington,* state's attorney, and, on the brief, *Paul J. Ferencek* and *Mary Elizabeth Baron,* assistant state's attorneys, for the appellant (state).

*Susan M. Hankins,* assistant public defender, for the appellee (defendant).

NORCOTT, J. This appeal concerns issues arising out of the criminal trial and sentencing of the defendant, Shawn Robinson. The principal issue presented is whether the defendant was prejudiced by the trial court's violation of its own witness sequestration order issued pursuant to General Statutes § 54-85a.[1] In accordance with our grant of certification,[2] the state appeals from the Appellate Court's determination that the trial court's breach of the sequestration order denied the defendant a fair trial.

---

[1] General Statutes § 54-85a provides: "SEQUESTERING OF WITNESSES IN CRIMINAL PROSECUTION. In any criminal prosecution, the court, upon motion of the state or the defendant, shall cause any witness to be sequestered during the hearing on any issue or motion or any part of the trial of such prosecution in which he is not testifying."

[2] We granted the state's petition for certification to appeal, *State* v. *Robinson,* 227 Conn. 928, 632 A.2d 706 (1994), limited to the following issues: (1) whether the defendant was prejudiced by the trial court's decision to allow a correction officer, who was guarding the defendant during the trial and was privy to the testimony of other witnesses, to testify in violation of a sequestration order; and (2) whether the trial court properly exercised its discretion when it denied the defendant's request for a psychological examination at the Whiting Forensic Institute, pursuant to General Statutes § 17a-566.

The defendant was charged with one count of possession of a weapon or dangerous instrument in a correctional facility in violation of General Statutes § 53a-174a (a),[3] and with two counts of assault in the second degree in violation of General Statutes § 53a-60 (a) (5).[4]

On September 12, 1991, prior to the commencement of trial, the trial court granted the defendant's motion in limine to sequester all witnesses[5] and to require all correction officers to testify in civilian clothing. The trial commenced on September 16, 1991, before a six person jury.

The state's case consisted of the testimony of eight correction officers.[6] They testified that on January 11, 1990, the defendant, while an inmate at the Connecticut correctional center in New Haven, had attacked a

[3] General Statutes § 53a-174a provides: "POSSESSION OF WEAPON OR DANGEROUS INSTRUMENT IN CORRECTIONAL INSTITUTION: CLASS B FELONY. (a) A person is guilty of possession of a weapon or dangerous instrument in a correctional institution when, being an inmate of such institution, he knowingly makes, conveys from place to place or has in his possession or under his control any firearm, weapon, dangerous instrument, explosive, or any other substance or thing designed to kill, injure or disable.

"(b) Possession of a weapon or dangerous instrument in a correctional institution is a class B felony."

[4] General Statutes § 53a-60 (a) (5) provides: "ASSAULT IN THE SECOND DEGREE: CLASS D FELONY. (a) A person is guilty of assault in the second degree when . . . (5) he is in the custody of the commissioner of correction, confined in any institution or facility of the department of correction, or is a parolee from a correctional institution and with intent to cause physical injury to an employee of the department of correction or an employee or member of the board of parole, he causes physical injury to such employee or member."

[5] The relevant portion of the sequestration order provides: "That the prosecuting authority sequester each of its witnesses at trial, warn each of its witnesses not to discuss with any other witness the contents of his/her testimony, and take reasonable steps necessary to insure that the contents of witnesses' testimony or prospective testimony is not otherwise exchanged or compared among witnesses."

[6] For a full recitation of the facts, see the Appellate Court's decision. *State v. Robinson*, 32 Conn. App. 448, 449–51, 630 A.2d 87 (1993).

group of correction officers who were attempting to place restraints on him. According to the officers' testimony, the defendant lunged at them with a shank that had been fashioned from the metal arch support from a prison issued inmate's shoe. Before the defendant was subdued with mace, three officers were injured. One officer required eleven stitches in his arm.

The defendant testified to a different version of the facts. He testified that the correction officers had been the aggressors and that they had attacked him in retribution for an incident that had occurred between the defendant and another correction officer the previous day. The defendant asserted that the charges had been initiated as part of an institutional coverup. The defendant testified that on the morning of January 11, he had been summoned to the captain's office to discuss the previous day's events. The defendant testified that he had asked Deputy Warden William Marcinczyk to take photographs of him to document the injuries he had received as a result of the altercation on the previous day. The defendant further testified that Marcinczyk had taken two polaroid photographs of him and that the defendant had retained one of them for "safekeeping." The defendant testified that he had given this photograph to his cousin approximately one-half hour later. The defendant also testified that he had then been approached by a trio of officers who had demanded that the defendant return the photograph. According to the defendant, as he had turned out his pockets to show them that he did not have the photograph, the officers had attacked him and he had been beaten, maced and dragged to isolation. The defendant stated that later that day he had been transferred back to Somers where William King, a correction officer, took five photographs of him shortly after he arrived. The defendant maintained that he had made copies of these photographs, had given one to his mother, another to his father, and

had kept one for himself. He testified that his copy of the photograph had been taken from his cell when it was searched by the correction officers. The defendant also testified that he had not had access to a camera. Finally, the defendant emphatically denied possessing the shank and assaulting the officers.

The defendant also called King and Mark Murray, another correction officer, to testify to the defendant's physical condition when he had arrived at Somers on the evening of January 11.[7] King testified that he had taken four photographs of the defendant in order to document the defendant's condition, which he described as a "superficial laceration on his lips." These photographs were subsequently lost. Similarly, Murray testified that when the defendant had arrived at Somers his "lips were swollen. The side of his face on both sides was swollen. There was some blood on the front of his shirt."

Both prior to and following their testimony, Murray and King remained in the courtroom guarding the defendant.[8] Although the defendant repeatedly objected to the presence of these subpoenaed witnesses in violation of the sequestration order, the court refused to exclude the officers from the courtroom.

[7] At the conclusion of the state's case, the defendant had subpoenaed the two correction officers, Murray and King, to testify. The state moved to preclude Murray as a witness because he had been present in court in violation of the sequestration order. This objection was overruled. The defendant then moved to exclude Murray from the courtroom because it was prejudicial to have a witness assume the role of guard after testifying. The court denied this request, stating that the jury had already viewed Murray in his capacity as a guard and that his removal would be an undue interference with security.

[8] The transcript does not record the exact dates on which Murray and King were present in the courtroom. It appears that Murray was present for three days of testimony, hearing the end of the state's case and the entirety of the defendant's case. King was present on the first day of the defendant's case as a witness and then was present on the two remaining days of the defendant's case guarding the defendant.

Marcinczyk also testified during the defendant's case. Marcinczyk confirmed that the defendant had filed a complaint with him on the morning of January 11. Marcinczyk also testified that at the defendant's request, he had taken photographs of the defendant. These photographs were subsequently lost. Further, the defendant called his father, Diago Robinson, to testify. Robinson, also an inmate at Somers, maintained that he had been in King's office when the defendant was photographed, and that the defendant had given him a copy of the photographs for safekeeping. The defendant introduced into evidence a copy of the photographs taken by King. Robinson also attested to the defendant's condition when he had arrived at Somers, recounting that the defendant's eye was swollen nearly shut, his lip was swollen, he was limping and he had bruises on his face.

On rebuttal, the state called King, who had been in the courtroom during the presentation of the defendant's entire case. The defendant objected on the ground that allowing King to take the stand would violate the sequestration order. The objection was overruled. King's rebuttal testimony directly contradicted the salient features of the testimony given by the defendant's witnesses. King testified that he had been with the defendant from the time he had arrived at Somers until the time he was placed in isolation. King denied that the defendant had been in contact with his father, or any other inmate, on that evening. King also stated that he had noticed no other injury to the defendant aside from a lip abrasion. Finally, King testified that Somers inmates generally had access to cameras and photocopy machines, although he had no knowledge as to whether the defendant had been given access to either.

The jury returned a verdict of guilty of possession of a weapon or dangerous instrument in a correctional facility, and a mistrial was declared as to the assault

charges.[9] The trial court sentenced the defendant to a term of twenty years imprisonment, to run consecutively with the defendant's sixty-two year sentence for prior convictions.

The defendant appealed from the judgment of conviction.[10] The Appellate Court held that the defendant was prejudiced by the trial court's failure to enforce its sequestration order by permitting a subpoenaed witness to remain in the court throughout the trial and by allowing that witness to be recalled by the state on rebuttal. In the Appellate Court's view, the sequestration violation was likely to have affected the jury's verdict in that it "went to the heart of the defense . . . [and King's] testimony directly contradicted that of the defense witnesses." *State* v. *Robinson,* 32 Conn. App. 448, 458, 630 A.2d 87 (1993). The judgment was reversed by the Appellate Court and the case was remanded for a new trial. Id. We granted the state certification to appeal this issue. We affirm the judgment of the Appellate Court.[11]

---

[9] On September 26, 1991, the jury returned a verdict of guilty as to all counts. The defendant then asked that the jury be polled individually. One juror, Lawanda Towles, when polled changed her vote to "not guilty" on the assault charges. The jury was excused for further deliberations, which proved to be futile. The court declared a mistrial as to these assault charges. The charges were dismissed on October 18, 1991. The state has chosen not to retry the defendant on these charges.

[10] The defendant argued on appeal that he was prejudiced by the court's violation of the sequestration order on three separate occasions: (1) by Murray's presence in court during King's defense testimony; (2) by the presence of both Murray and King after their testimony and during the remainder of the defendant's case; and (3) by King's rebuttal testimony. The Appellate Court concluded that the defendant was prejudiced only by the third occurrence, King's rebuttal testimony. Hence, we limit our review to this claim.

[11] Because we conclude that a new trial is required, we do not address the alternative grounds put forth by the defendant that: (1) the trial court improperly granted the state's motion in limine to preclude testimony relating to prior incidents between the defendant and the correction officers that purportedly showed that the officers were the aggressors and demon-

I

The state claims that the Appellate Court improperly determined that the trial court's decision to allow the rebuttal testimony of a correction officer who had been guarding the defendant during trial was so prejudicial as to require a new trial. Specifically, the state argues that: (1) the defendant was not harmed by the violation of the sequestration order because King did not tailor his testimony to conform to the testimony of other witnesses; (2) any harm caused by the violation of the sequestration order could have been or was mitigated through cross-examination, jury instructions and closing arguments; (3) King's testimony related solely to the defendant's claim of self-defense on the dismissed assault charges and did not pertain to the defendant's conviction on the possession charge; and (4) the violation of the sequestration order was justified because the defendant posed a security risk. We disagree.

The state concedes, as it must, that the trial court violated the sequestration order when it allowed King to take the stand. See *State* v. *Stovall,* 199 Conn. 62, 68, 505 A.2d 708 (1986); *State* v. *Sullivan,* 11 Conn. App. 80, 84, 525 A.2d 1353 (1987). The right to have witnesses sequestered is an important right that facilitates the truth-seeking and fact-finding functions of a trial. *Geders* v. *United States,* 425 U.S. 80, 87, 96 S. Ct. 1330, 47 L. Ed. 2d 592 (1976). In Connecticut, the granting of a sequestration order in criminal cases is not discretionary and can be invoked by either party. General Statutes § 54-85a; see footnote 1; see also *State* v. *Paolella,* 211 Conn. 672, 681, 561 A.2d 111 (1989);

strated motive and bias on the part of the state's witnesses; and (2) the trial court improperly denied the defendant's requests to examine jurors and to declare a mistrial because the jury was allegedly exposed to inflammatory media coverage during trial.

*State* v. *Soltes,* 20 Conn. App. 342, 346, 566 A.2d 1374 (1989), appeal dismissed, 215 Conn. 614, 577 A.2d 717 (1990); *State* v. *Arroyo,* 13 Conn. App. 687, 693, 539 A.2d 581, cert. denied, 208 Conn. 805, 545 A.2d 1103 (1988). Practice Book § 876 provides: "The judicial authority upon motion of the prosecuting authority or of the defendant *shall* cause any witness to be sequestered during the hearing on any issue or motion or during any part of the trial in which he is not testifying." (Emphasis added.)

The state, however, argues that the violation did not prejudice the defendant. A violation of a sequestration order does not automatically require a new trial. *Holder* v. *United States,* 150 U.S. 91, 92, 14 S. Ct. 10, 37 L. Ed. 1010 (1893); *State* v. *Scott,* 16 Conn. App. 172, 182, 547 A.2d 77, cert. denied, 209 Conn. 821, 551 A.2d 758 (1988). The controlling consideration is whether the defendant has been prejudiced by the violation. *State* v. *Stovall,* supra, 199 Conn. 69. The burden rests on the party requesting the sequestration to show that the violation was prejudicial. *State* v. *Paolella,* supra, 211 Conn. 680–81; *State* v. *Silveira,* 198 Conn. 454, 479, 503 A.2d 599 (1986); *State* v. *Ruth,* 181 Conn. 187, 196–97, 435 A.2d 3 (1980). If the prejudice resulting from the violation is likely to have affected the jury's verdict, a new trial must be ordered. *State* v. *Brown,* 187 Conn. 602, 611, 447 A.2d 734 (1982).

A

The state first contends that King's testimony was not prejudicial because it did not frustrate the purposes of sequestration. The state argues that the sole purpose of sequestration is to prevent a witness from corroborating testimony, not to preclude testimony such as King's, which merely contradicts the testimony of the other witnesses. We are not persuaded by the state's argument.

Sequestration serves a broad purpose. It is a procedural device that serves to prevent witnesses from tailoring their testimony to that of earlier witnesses; it aids in detecting testimony that is less than candid and assures that witnesses testify on the basis of their own knowledge. *Geders* v. *United States,* supra, 425 U.S. 87; see 6 J. Wigmore, Evidence (Chadbourn Rev. 1976) § 1838; see also *State* v. *Pikul,* 150 Conn. 195, 200, 187 A.2d 442 (1962). In essence, it helps to ensure that the trial is fair. *State* v. *Paolella,* supra, 211 Conn. 680–81; *State* v. *Stovall,* supra, 199 Conn. 69; *State* v. *Scott,* supra, 16 Conn. App. 182; C. Tait & J. LaPlante, Handbook of Connecticut Evidence (2d Ed. 1988) § 7.29. The mandate of § 54-85a is clear; it does not distinguish between categories of testimony. See *State* v. *Cavell,* 34 Conn. App. 276, 641 A.2d 426 (1994) (upholding striking of testimony of medical expert who had reviewed testimony of prior witness in violation of sequestration order); *State* v. *Soltes,* supra, 20 Conn. App. 346–47 (sequestration order applies to all witnesses including expert witnesses). Hence, the distinction that the state asks us to make between contradictory and corroborating testimony is a hollow one.

Our inquiry, however, does not end here. Not all testimony that is tainted by a violation of a sequestration order is necessarily prejudicial. Rather, "[a]n inquiry into the facts and circumstances of each case is necessary to ascertain whether the purpose of a sequestration order has been thwarted."[12] *State* v. *Scott,* supra,

---

[12] The state relies on *State* v. *Paolella,* supra, 211 Conn. 680–81, for the proposition that the violation of a sequestration order is not necessarily prejudicial. We agree that not all sequestration violations are prejudicial. In *Paolella,* the witness testified *before* violating the sequestration order and did not prejudice the defendant because the witness was unable to tailor her testimony. Specifically, the court allowed the complainant to remain in the courtroom during the testimony of her minor children after she had testified, in violation of the sequestration order. This court upheld the ruling because "at the time the children took the stand, the complainant had

16 Conn. App. 182. Our analysis involves two steps. First, we must determine whether King's testimony was in any way tailored to the testimony he had heard in violation of the sequestration order; and second, if it was tailored, whether that testimony is likely to have affected the jury's verdict.

It is probable, in the present case, that King's testimony was tailored to that of the other witnesses. First, King testified after having listened to the testimony of every one of the defendant's witnesses. His testimony was critical in that it rebutted two important aspects of the defense: (1) that the defendant's injury had not been limited to a bruise on his lip; and (2) that the defendant had lacked access to cameras and photocopy machines.[13] Second, the prosecution of the defendant involved an assault on King's fellow correction officers, giving King motive to mold his testimony. Third, it is likely that King's testimony was influenced

already testified and, therefore, she was unable to tailor her testimony to correspond to that of her children. Since the purpose of the sequestration order was not undermined by the complainant's presence in the courtroom during the children's testimony, the trial court's decision to exempt her from its order was not in any way prejudicial to the defendant in that regard." Id., 681; see also *State* v. *Stovall,* supra, 199 Conn. 66–67 (witness' presence during counsel's legal arguments regarding an alleged inconsistency in her testimony was not prejudicial).

[13] Many courts have held that the violation of a sequestration order does not prejudice the defendant when the testimony is rebuttal. See, e.g., *United States* v. *Shurn,* 849 F.2d 1090, 1094 (8th Cir. 1988); *United States* v. *Bramlet,* 820 F.2d 851, 855 (7th Cir.), cert. denied, 484 U.S. 861, 108 S. Ct. 175, 98 L. Ed. 2d 129 (1987). These courts have held that, unlike testimony of fact witnesses, testimony of rebuttal witnesses is directed toward impeaching the prior testimony of opposing witnesses, and thereby serves a totally different function.

In the current case, although King was called as a rebuttal witness, his testimony was neither merely cumulative nor "simply impeaching." *United States* v. *Shurn,* supra, 849 F.2d 1094. Rather, his testimony disclosed new facts that were not already in evidence, including the fact that the defendant had access to cameras and photocopy machines. King's "credibility was a crucial element in the government's case . . . ." *United States* v. *Nazzaro,* 472 F.2d 302, 308–309 (2d Cir. 1973).

by the testimony he heard. Testimony may "be affected in subtle, inadvertent ways by exposure to the *differing* views of a colleague." (Emphasis added.) *State* v. *Falby,* 187 Conn. 6, 27, 444 A.2d 213 (1982) (giving state's expert transcript of testimony of defendant's expert testimony, in violation of sequestration order, was harmful). A "fact finder's appreciation for and determination of relevant facts must remain unsullied by the potential for subtle, yet significantly distorted modification of witness testimony." *United States* v. *Bramlet,* 820 F.2d 851, 855 (7th Cir.), cert. denied, 484 U.S. 861, 108 S. Ct. 175, 98 L. Ed. 2d 129 (1987). Hence, King's exposure to the testimony of other witnesses likely compromised both the reliability and integrity of his testimony. See *Fendler* v. *Goldsmith,* 728 F.2d 1181, 1186 (9th Cir. 1983); *State* v. *Soltes,* supra, 20 Conn App. 346–47.

In addition, it is likely that the jury found King's testimony to be highly reliable and credible. The harm resulting from King's testimony was exacerbated by his status as a uniformed correction officer entrusted with guarding the defendant during the trial. See *State* v. *Woolcock,* 201 Conn. 605, 617–18, 518 A.2d 1377 (1986). His credibility with the jury may have been enhanced by his position as a captain. In fact, his skills and training as an officer were highly touted to the jury by both the state's and the defendant's counsel. Accordingly, the jury may have put great weight on the substance of his testimony. *State* v. *Smith,* 222 Conn. 1, 27–28, 608 A.2d 63, cert. denied,    U.S.   , 113 S. Ct. 383, 121 L. Ed. 2d 293 (1992); *State* v. *Lewis,* 220 Conn. 602, 600 A.2d 1330 (1991); see also *State* v. *Hardison,* 16 Conn. App. 142, 145, 546 A.2d 968 (1988) ("permissible for the jury to consider [the police officers'] special training and experience with regard to their ability to observe, remember and record events").

We determine that King's exposure to the defendant's case tainted his testimony, prejudiced the defendant, and was likely to have affected the jury's verdict. That harm was compounded by the fact that King was a correction officer, assigned to guard the defendant during trial. We agree with the Appellate Court that the trial court improperly allowed a subpoenaed correction officer to guard the defendant during trial and later to assume the stand in rebuttal in violation of the sequestration order.

## B

The state next argues that the violation was harmless because the defendant had an adequate opportunity to neutralize any prejudicial effects of King's testimony through cross-examination, jury instructions and closing arguments. In our view, such safeguards could not and did not adequately counter the effect of the violation of the sequestration order because of the extreme nature of the prejudice caused by King's rebuttal testimony.

The defendant's cross-examination of King was ineffectual because there was no evidentiary foundation by which to gauge the accuracy of King's testimony. King had not given pretrial testimony relating to his rebuttal testimony. Cf. *State* v. *Sullivan,* supra, 11 Conn. App. 85 (no harm resulted from violation of sequestration order where mother testified after hearing her nine year old daughter testify because mother's testimony was consistent with her pretrial hearing testimony). Once a witness has heard others testify, it is much more difficult for a cross-examiner to expose fabrication, collusion, inconsistencies or inaccuracies. *Perry* v. *Leeke,* 488 U.S. 272, 281, 109 S. Ct. 594, 102 L. Ed. 2d 624 (1989). Because the defendant had no basis on which to impeach King's testimony, he was unable to conduct an effective cross-examination of King.

The state also argues that the defendant should have mitigated the impact of the harm through requests for jury instructions and through his own closing argument. The defendant did in fact request the trial court to instruct the jury on the credibility of the witnesses who had testified in violation of the sequestration order.[14] This request was denied. Although it is true that "[i]f curative action can obviate the prejudice, the drastic remedy of a mistrial should be avoided"; (internal quotation marks omitted) *State* v. *Wooten,* 227 Conn. 677, 694, 631 A.2d 271 (1993); a party is not under a duty to request jury instructions or to address a violation of a sequestration order in closing arguments once he has properly taken an exception. Once an objection has been reserved, no further action is necessary because the trial court has been alerted to the "purported error while there is time to correct it without ordering a retrial." *State* v. *Christiano,* 228 Conn. 456, 464, 637 A.2d 382 (1994); *State* v. *Rothenberg,* 195 Conn. 253, 263, 487 A.2d 545 (1985). A party need not repeatedly raise an objection at closing argument or by requests for jury instructions.

[14] The applicable request regarding the jury charge is as follows:

"Mr. Rosenthal: Your Honor, with respect to these claims, in addition to the closing argument portion of the claims, there is also a concern I have that just the nature of the way in which the credibility of corrections officer was pitched against, and credibility of corrections officers was bolstered by their background, et cetera, once again reinforces the concern we expressed in our due process claim as to the inappropriateness of corrections officers in uniform in the courtroom taking the stand, violating sequestration order and having the number of corrections officers and sheriffs that there were in the room. All of those things that I know are already on the record, I would claim the summation have reinforced the problems that we have previously claimed and would ask Your Honor to reconsider Your Honor's ruling in that regard.

"The Court: All right. Your remarks are noted. I don't intend to say anything concerning arguments during my charge, and to the extent that you feel I should, may I suggest that you do that at the conclusion of the charge in the form of an exception to the charge. I think that would be probably the best way to preserve it."

## C

The state also argues that King's testimony did not relate to the charges of which the defendant was convicted and therefore was not prejudicial. Rather, the state asserts that King's testimony related only to the defendant's self-defense claim on the assault charges, and not to the possession of a dangerous instrument charge. The state further contends that, because a mistrial was declared on the assault charges, the defendant was not prejudiced by King's testimony. We disagree.

The defendant contested every element of each charge brought against him on the ground that he was framed by the correction officers. Most importantly, the defendant denied possessing the shank and attacking the officer. King's rebuttal testimony directly undermined the defendant's version of events and undermined the credibility of every one of the defendant's witnesses. First, King testified that no one had an opportunity to see the defendant at the time of his arrival at Somers and, therefore, directly disputed the contrary testimony of the defendant's father. In addition, King disputed Murray's assessment of the defendant's physical condition. Finally, although King admitted taking the photographs that documented the defendant's condition, King's testimony that inmates had access to cameras substantially diminished the evidentiary value of the photocopy by supporting the inference suggested by the state that the defendant had fabricated the copy of the photographs. King's testimony, therefore, went beyond contesting the defendant's claim of self-defense with respect to the assault charge.

## D

The state further argues that the trial court properly exercised its discretion by requiring King's pres-

ence in the courtroom because the defendant posed a security risk. Although it is well established that a trial court has the discretion to prevent trial disruptions and to ensure courtroom security; *Harrell* v. *Israel,* 672 F.2d 632, 635 (7th Cir. 1982); *State* v. *Williams,* 195 Conn. 1, 7, 485 A.2d 570 (1985); that does not mean that special circumstances may not outweigh the personnel assignment decision of the department of correction. Therefore, while the circumstances may have dictated the attendance of a certain number of correction officers, King himself was not vital. See *State* v. *Woolcock,* supra, 201 Conn. 617 (presence of identifiable security officers in courtroom is not inherently prejudicial, but circumstances should be evaluated on case-by-case basis). In fact, the record suggests that the correction officers could have made alternate arrangements, such as switching assignments with other Somers officers also present at the courthouse.[15]

[15] For example:

"The Court: Is there any reason, I mean do you know whether you are going to be assigned to this case next Monday or not?

"Correction Officer Murray: I believe so. I am assigned to this case, sir, Monday. The schedules were made up. I was told I was going to be put on it as an assignment. The schedules are probably made up already for Saturday, Sunday and Monday and possibly Tuesday.

"You know, it could have been arranged. If I didn't get the subpoena so late yesterday, I could have gone over it with my supervisors, and we could have switched around.

"The Court: Can you switch around for Monday?

"Correction Officer Murray: I could try. Yes, sir.

"The Court: Why don't you try, and if you can switch around so that you are not assigned to this case, would you come back in civilian clothes?

"Correction Officer Murray: Or if I am assigned to a case in New Haven, could I bring civilian clothes?

"The Court: Bring a change of clothes so that when you testify here—

"Correction Officer Murray: I will do that. It is so minute to cause such a problem.

"The Court: Well, we do our best to be fair to everybody, and that's what I am trying to do, to cause the minimum of inconvenience to everybody. That's why I am asking that you do your best to see if you can get things changed for Monday, and if you can't, we will deal with it, but I am going to ask that you do that."

The security concerns easily could have been alleviated, in compliance with the sequestration order, without any undue strain on the correctional system. Accordingly, we are not persuaded by the state's claim.

## II

The second issue raised in this appeal relates to the defendant's request for a psychiatric examination at the Whiting Forensic Institute, pursuant to General Statutes § 17a-566.[16] The state claims that the Appellate Court improperly concluded that the trial court improperly failed to exercise its discretion when it denied the defendant's request for a psychiatric examination. The Appellate Court determined that the trial court's denial was based on the incorrect conclusion that it could not order a § 17a-566 psychiatric examination because at the time of trial the defendant was a sentenced prisoner. Consequently, the Appellate Court concluded that the trial court failed to exercise its discretion. The Appellate Court considered this issue as one "likely to affect the proceedings on remand." *State* v. *Robinson,* supra, 32 Conn. App. 459 n.8.

It is our view that this is not such an issue and that it was therefore improper for the Appellate Court to consider it. This issue will not affect the proceedings on remand unless: (1) the defendant is convicted; (2) the defendant requests a psychiatric examination pursuant to § 17a-566; and (3) the trial court denies the request

[16] General Statutes § 17a-566 provides in relevant part: "CERTAIN CONVICTED PERSONS TO BE EXAMINED. REPORT AND RECOMMENDATION. (a) Except as provided in section 17a-574 any court prior to sentencing a person convicted of an offense for which the penalty may be imprisonment in the Connecticut Correctional Institution at Somers . . . may if it appears to the court that such person is mentally ill and dangerous to himself or others, upon its own motion or upon request of any of the persons enumerated in subsection (b) of this section and a subsequent finding that such request is justified, order the commissioner to conduct an examination of the convicted defendant by qualified personnel of the institute. . . ."

for the same reasons as did the trial court in the present case. We conclude these three issues are not likely to occur on retrial. Accordingly, we decline to address the merits of the state's claim.[17]

The judgment of the Appellate Court is affirmed.

In this opinion the other justices concurred.

[17] Our decision not to review the state's claim is purely the result of our determination that it is not an issue that is likely to arise on remand, and does not express approval of the Appellate Court's disposition of the claim.