## STATE OF CONNECTICUT *v.* LARRY TWEEDY
### (14103)

SHEA, CALLAHAN, GLASS, COVELLO and BORDEN, Js.

Argued March 26—decision released July 16, 1991

*Temmy Ann Pieszak,* assistant public defender, with whom, on the brief, was *G. Douglas Nash,* public defender, for the appellant (defendant).

*Rita M. Shair,* assistant state's attorney, with whom were *James G. Clark,* assistant state's attorney, and, on the brief, *Michael Dearington,* state's attorney, and *Kathryn St. Amand,* law student intern, for the appellee (state).

GLASS, J. After a jury trial, the defendant, Larry Tweedy, was convicted of two counts of robbery in the first degree in violation of General Statutes § 53a-134 (a) (4),[1] one count of kidnapping in the first degree in violation of General Statutes

---

[1] General Statutes § 53a-134 (a) (4) provides in pertinent part: "A person is guilty of robbery in the first degree when, in the course of the com-

§ 53a-92 (a) (2) (A),[2] one count of kidnapping in the first degree in violation of General Statutes § 53a-92 (a) (2) (B),[3] one count of burglary in the third degree in violation of General Statutes § 53a-103,[4] and one count of sexual assault in the first degree in violation of General Statutes § 53a-70.[5] The trial court sentenced the defendant to a total effective term of thirty-four years imprisonment, and this appeal followed.

On appeal, the defendant claims that: (1) the court improperly punished him twice for the same offense of first degree kidnapping in violation of the double jeopardy provisions of the federal constitution; (2) the court improperly punished him twice for the same offense of first degree robbery in violation of the double jeopardy provisions of the federal constitution; (3) the evidence of abduction within the meaning of Gen-

---

mission of the crime or of immediate flight therefrom, he or another participant in the crime . . . (4) displays or threatens the use of what he represents by his words or conduct to be a pistol, revolver, rifle, shotgun, machine gun or other firearm . . . ."

[2] "[General Statutes] Sec. 53a-92. KIDNAPPING IN THE FIRST DEGREE: CLASS A FELONY. (a) A person is guilty of kidnapping in the first degree when he abducts another person and when . . . (2) he restrains the person abducted with intent to (A) inflict physical injury upon him or violate or abuse him sexually; or (B) accomplish or advance the commission of a felony . . . ."

[3] See footnote 2, supra.

[4] "[General Statutes] Sec. 53a-103. BURGLARY IN THE THIRD DEGREE: CLASS D FELONY. (a) A person is guilty of burglary in the third degree when he enters or remains unlawfully in a building with intent to commit a crime therein."

[5] General Statutes (Rev. to 1987) § 53a-70 provides in pertinent part: "(a) A person is guilty of sexual assault in the first degree when such person compels another person to engage in sexual intercourse by the use of force against such other person or a third person, or by the threat of use of force against such other person or against a third person which reasonably causes such person to fear physical injury to such person or a third person."

eral Statutes § 53a-91[6] was insufficient to sustain the jury's verdict finding him guilty of the crime of first degree kidnapping in violation of § 53a-92 (a) (2) (A); (4) § 53a-92 (a) (2) (A) is unconstitutionally vague as applied to the facts supporting the defendant's conviction of first degree kidnapping; (5) the court deprived the defendant of a fair trial by shackling him at trial; (6) the prosecutor's pervasive misconduct impaired the defendant's constitutional rights; and (7) the court improperly failed to deliver certain instructions to the jury. We affirm the judgment of conviction on all counts.

The jury could reasonably have found the following facts. At approximately 8 a.m. on October 2, 1988, the victim, after purchasing a Sunday newspaper, returned to her apartment in New Haven. As the victim unlocked the outside door to the apartment building, the defendant came up behind her and asked if someone named Mike lived in the building. The victim replied that she did not know and entered the building. Realizing that the defendant had followed her into the building, the victim stepped aside and asked him to pass ahead in the hallway. The defendant refused to pass and ordered the victim to enter her apartment. When the victim threatened to scream, the defendant warned her that she should not because he had a gun. The victim then attempted to enter her apartment and lock the door, but the defendant wedged an arm and leg inside the door and forced his way into the apartment.

---

[6] "[General Statutes] Sec. 53a-91. DEFINITIONS.

"(1) 'Restrain' means to restrict a person's movements intentionally and unlawfully in such a manner as to interfere substantially with his liberty by moving him from one place to another, or by confining him either in the place where the restriction commences or in a place to which he has been moved, without consent.

"(2) 'Abduct' means to restrain a person with intent to prevent his liberation by either (a) secreting or holding him in a place where he is not likely to be found, or (b) using or threatening to use physical force or intimidation."

Once inside, the defendant stood close to the victim in the entryway of the apartment and demanded money. The victim gave him the bills and coins that were in her pocket, and, after the defendant threw the coins on the floor, she told him that she had more money in a desk in her bedroom. While the defendant followed close behind her, the victim walked through the living room, down the hallway and into the bedroom, where she gave the defendant the money located in her desk. The defendant then demanded valuables and took a camera from the victim. Upon the defendant's insistence for more money, the victim, in an attempt to get him out of her apartment, told him that she could obtain money from an automatic teller machine (ATM) at a nearby bank. The defendant did not respond, but began to search the victim's desk and closet for valuables.

At some point during the bedroom search, the defendant commanded the victim to undress and sit on her bed. The defendant thereafter ordered the victim to get up and show him where she kept her jewelry, and followed her as she crossed the room from the bed to her bureau. After taking a gold crucifix from the bureau drawer, the defendant roughly grabbed the victim's breasts and demanded that she return to the bed and lie down. The defendant then ceased his search for valuables and approached the victim where she lay on her bed. The defendant reminded the victim not to scream because he had a gun and proceeded to engage in non-consensual sexual intercourse with her.

Afterward, the defendant ordered the victim to dress and told her that they were going to walk together to the bank where she would withdraw money from the ATM. Before they left the apartment, the defendant went into the bathroom and returned with his jacket wrapped around his hand. The defendant explained that his jacket concealed the gun, and told the victim that

she should not scream or otherwise indicate that she was in danger during the walk to the bank because he had killed people before and was willing to kill her. The victim saw "something metallic" between the folds of the defendant's jacket.

The victim then walked several blocks to the bank with the defendant following directly behind her. At the bank, the defendant instructed the victim to withdraw approximately $800 from the ATM. The victim withdrew $200, the daily withdrawal limit. The defendant removed that amount of money from the ATM and put it in his pocket. Thereafter, the defendant directed the victim to walk down an alley without looking back, and he left the area. The victim testified at the defendant's subsequent trial that she had complied with his various demands in order to survive.

## I

The defendant initially claims that the trial court, by convicting him of two counts of first degree kidnapping based on charges alleging his commission of offenses that arose out of the same transaction, punished him twice for the same offense in violation of the double jeopardy provisions of the federal constitution.[7] In support of this claim, the defendant points out that his convictions for the offenses of first degree kidnapping under both subdivisions (A) and (B) of § 53a-92 (a) (2), respectively based on the third and fifth counts of the state's substitute information,[8] arose from

[7] Despite the defendant's conceded failure to preserve this claim at trial, we review the claim because it is "a claim of double jeopardy based on multiple punishments for convictions obtained at a single trial." *State* v. *Ruscoe,* 212 Conn. 223, 256, 563 A.2d 267 (1989), cert. denied, 493 U.S. 1084, 110 S. Ct. 1144, 107 L. Ed. 2d 1049 (1990); see *State* v. *Snook,* 210 Conn. 244, 263–64, 555 A.2d 390, cert. denied, 492 U.S. 924, 109 S. Ct. 3258, 106 L. Ed. 2d 603 (1989).

[8] In the third count of the substitute information, the state alleged that "at approximately 8:30 a.m. on October 2, 1988, at [the victim's apartment]

a thirty minute transaction within the same city and involving the same victim. The state contends that even if the offenses were assumed to have arisen from the same transaction, the defendant's double jeopardy claim nevertheless fails because the two kidnapping charges alleged violations of distinct statutory provisions, and therefore, the commission of separate offenses. Assuming that the offenses arose from the same transaction, we agree with the state.

As we approach the defendant's claim, the only disputed question is whether the crimes of kidnapping in the first degree under subdivisions (A) and (B) of § 53a-92 (a) (2) are the same offense for purposes of double jeopardy. "The traditional test for determining whether two offenses are the same offense for double jeopardy purposes was set forth in *Blockburger* v. *United States,* 284 U.S. 299, 52 S. Ct. 180, 76 L. Ed. 306 (1932)." *State* v. *Chicano,* 216 Conn. 699, 706–707, 584 A.2d 425 (1990). Under the *Blockburger* test, "a defendant may be convicted of two offenses arising out of the same criminal incident if each crime contains an element not found in the other." *State* v. *Vass,* 191 Conn. 604, 615, 469 A.2d 767 (1983); see *State* v. *Greco,* 216 Conn. 282, 291, 579 A.2d 84 (1990). We determine whether each crime contains an element not found in the other by examining only the relevant statute, the information and the bill of particulars, and not the evidence presented at trial. *State* v. *Greco,* supra.

in New Haven, [the defendant] abducted [the victim], and restrained her with the intent to violate or abuse her sexually, in violation of General Statutes § 53a-92 (a) (2) (A)."

In the fifth count of the substitute information, the state alleged that "at approximately 9:00 a.m. on October 2, 1988, at various locations between [the victim's apartment] and 77 Broadway in New Haven, [the defendant] abducted [the victim] and restrained her with the intent to accomplish or advance the commission of a felony, robbery, in violation of General Statutes § 53a-92 (a) (2) (B)."

Our perusal of these materials in the present case discloses that the charged crimes of kidnapping in the first degree under subdivisions (A) and (B) of § 53a-92 (a) (2) are separate offenses for double jeopardy purposes. To convict the defendant of first degree kidnapping under subdivision (A) of the statute, the state had to prove, as alleged in the third count of the substitute information, that the defendant abducted the victim with a specific intent to violate or abuse her sexually. See *State* v. *Palmer,* 206 Conn. 40, 54, 536 A.2d 936 (1988). On the other hand, to convict the defendant of first degree kidnapping under subdivision (B) of § 53a-92 (a) (2), the state was required to establish, as alleged in the fifth count of the substitute information, that he abducted the victim with the specific intent to achieve the felonious objective of robbery. See *State* v. *Wright,* 197 Conn. 588, 591, 500 A.2d 547 (1985). The substitute information, therefore, alleged that the defendant committed two separate offenses of kidnapping in the first degree, each of which required proof of an element that the other did not. As a consequence, the trial court could properly punish the defendant for both crimes without offending the double jeopardy clause.

## II

The defendant next argues that his two convictions of first degree robbery under § 53a-134 (a) (4) constituted multiple punishment for the same offense in violation of the double jeopardy clause of the federal constitution.[9] The convictions were based upon the first and sixth counts of the substitute information, in which the state respectively alleged that the defendant had robbed the victim "at approximately 8:30 a.m. on

---

[9] We review the defendant's double jeopardy claim, which he did not preserve at trial, because it concerns multiple punishments for convictions obtained at a single trial. See footnote 7, supra.

October 2, 1988, at [her apartment] in the City of New Haven," and then had robbed her again "at approximately 9:00 a.m. on October 2, 1988 at 77 Broadway [her bank] in New Haven . . . ." According to the defendant, the events at the victim's apartment and the bank were part of a continuing transaction during which he committed a single robbery. The separation of this transaction to form the basis of two robbery charges and convictions, the defendant maintains, contravenes the legislature's intent that the unit of prosecution for the crime of robbery turn upon the number of victims intimidated by a defendant's use or threatened use of force. Where, as here, a single victim is subjected to continuous intimidation by a defendant's unceasing forcible conduct, the defendant claims that the legislature intended that such a course of conduct be punished as a single robbery. We disagree.

Double jeopardy prohibits multiple punishments for the same offense in the context of a single trial. Nonetheless, distinct repetitions of a prohibited act, "however closely they may follow each other"; *Blockburger* v. *United States,* supra, 302; may be punished as separate crimes without offending the double jeopardy clause. *State* v. *Snook,* 210 Conn. 244, 262, 555 A.2d 390, cert. denied, 492 U.S. 924, 109 S. Ct. 3258, 106 L. Ed. 2d 603 (1989); see *State* v. *Eason,* 192 Conn. 37, 46–47, 470 A.2d 688 (1984); see also *United States* v. *Hawkins,* 794 F.2d 589, 590 (11th Cir. 1986). "The same transaction," in other words, "may constitute separate and distinct crimes where it is susceptible of separation into parts, each of which in itself constitutes a completed offense." *Robinson* v. *United States,* 143 F.2d 276, 277 (10th Cir. 1944), approved in *Bell* v. *United States,* 349 U.S. 81, 75 S. Ct. 620, 99 L. Ed. 905 (1955). "[T]he test is not whether the criminal intent is one and the same and inspiring the whole transaction, but whether separate acts have been com-

mitted with the requisite criminal intent and are such as are made punishable by the [statute]." *Morgan* v. *Devine*, 237 U.S. 632, 640, 35 S. Ct. 712, 59 L. Ed. 1153 (1915); accord *United States* v. *Melton*, 763 F.2d 401, 402 (11th Cir. 1985); *United States* v. *Shaid*, 730 F.2d 225, 226 (5th Cir. 1984).

General Statutes § 53a-133, which defines robbery, provides that a defendant "commits robbery when, in the course of committing a larceny, he uses or threatens the immediate use of physical force upon another person for the purpose of: (1) Preventing or overcoming resistance to the taking of the property or to the retention thereof immediately after the taking; or (2) compelling the owner of such property or another person to deliver up the property or to engage in other conduct which aids in the commission of the larceny." As the defendant points out, we have identified the distinguishing feature of robbery as "the intimidation of the victim"; *State* v. *Hawthorne*, 175 Conn. 569, 573, 402 A.2d 759 (1978); and further, we have construed the singular term "another person" in § 53a-133 to evince the legislative purpose that a spatially indistinct robbery of two individuals be punishable as two separate offenses of robbery. See *State* v. *Lytell*, 206 Conn. 657, 666–67, 539 A.2d 133 (1988). We do not share, however, the defendant's perception that the legislature intended that robbery constitute an offense continuing for the period during which a defendant's forcible conduct intimidates a single victim.

The plain terms of § 53a-133 indicate a contrary intent. Specifically, the statute provides that a criminal defendant "commits robbery when, in the course of committing a larceny," the defendant engages in forcible conduct with a proscribed purpose. The legislature thus expressly designated "the course of committing a larceny," rather than the course of forcible conduct, as the time frame for completion of the

offense of robbery.[10] See *State* v. *Gordon,* 185 Conn. 402, 410–11, 441 A.2d 119 (1981), cert. denied, 455 U.S. 989, 102 S. Ct. 1612, 71 L. Ed. 2d 848 (1982). A consistent expression of legislative purpose is found in the commentary to our penal code, in which the drafters of the provision now codified as § 53a-133 describe the offense of robbery as "a larceny accompanied by force or threat." Commentary, Commission to Revise the Criminal Statutes (1969) p. 64. Consequently, we conclude that the legislature intended § 53a-133 to authorize a punishment for robbery each time a criminal defendant with the requisite intent engages in forcible conduct against another person "in the course of committing a larceny," irrespective of whether such conduct is unceasingly directed toward a single victim. "A different view would allow a person who has committed one [robbery] upon a victim to commit with impunity many other such acts during the same encounter." *State* v. *Frazier,* 185 Conn. 211, 229, 440 A.2d 916 (1981), cert. denied, 458 U.S. 1112, 102 S. Ct. 3496, 73 L. Ed. 2d 1375 (1982).

In the present case, the defendant committed two completed and hence separately punishable offenses of robbery as defined by § 53a-133. The defendant first committed a completed offense of robbery by threatening to shoot the victim with the requisite purpose "in the course of committing a larceny" at 8 a.m. within her apartment. The defendant then committed a sec-

---

[10] The drafters of the Model Penal Code of the American Law Institute comment that the similar phrase "in the course of committing a theft" in Model Penal Code § 222.1, which defines robbery, describes the time span of the larcenous conduct during which the specified injuries or threats will constitute a robbery. There are three successive stages: "an attempt to commit a theft, the theft itself, and the flight after the attempt or the theft." Model Penal Code § 222.1, comment 4 (a). "Thus, a robbery is committed if [the requisite injurious or threatening conduct and mental state] exist at any point from the beginning of an attempt to commit a theft through the end of the flight following its attempt or commission." Id., comment 2.

ond completed offense of robbery by threatening to shoot the victim with the requisite purpose "in the course of committing a larceny" at 9 a.m. at the bank located several blocks from her apartment. The offenses were committed at different times, locations and under different circumstances, and were also separated by an intervening act of sexual assault. Because the defendant committed two separate and distinct robberies, the trial court was authorized by § 53a-133 to punish him separately for each offense under § 53a-134 (a) (4).

## III

The defendant next claims that the evidence of abduction within the meaning of § 53a-91 (2) was insufficient to support the jury's verdict finding him guilty of the crime of first degree kidnapping in violation of § 53a-92 (a) (2) (A). This kidnapping conviction was based on the third count of the substitute information, in which the state alleged that "at approximately 8:30 a.m. on October 2, 1988, at [the victim's apartment] in New Haven, [the defendant] abducted [the victim], and restrained her with the intent to violate her or abuse her sexually" in violation of the statute. In the defendant's view, there is "simply no evidence" from which the jury could have inferred that he had possessed the "intent to prevent [the victim's] liberation." General Statutes § 53a-91 (2). We are unpersuaded.

Appellate analysis of an insufficiency of the evidence claim necessitates the undertaking of a twofold task. We first review the evidence in the light most favorable to sustaining the guilty verdict. *State* v. *Marra,* 215 Conn. 716, 726, 579 A.2d 9 (1990). We then determine whether any rational trier of fact could have concluded, upon the facts thus established and the inferences reasonably drawn therefrom, that the cumulative effect of the evidence established guilt beyond

a reasonable doubt. *State* v. *King,* 216 Conn. 585, 600, 583 A.2d 896 (1990). In this analysis, it does not diminish the probative force of the evidence that any part of it is circumstantial rather than direct evidence. Id., 602; *State* v. *Marra,* supra. " 'Intent is a mental process which ordinarily can be proven only by circumstantial evidence.' " *State* v. *Just,* 185 Conn. 339, 355, 441 A.2d 98 (1981).

Considering the evidence in the present case in the light most favorable to sustaining the verdict, we conclude that the jury could reasonably have determined that the evidence cumulatively established beyond a reasonable doubt that the defendant intended "to prevent [the victim's] liberation by . . . using or threatening to use physical force or intimidation." General Statutes § 53a-91 (2) (b). The evidence showed, for example, that the defendant initially thwarted the victim's attempt to lock him out of her apartment by forcing his way inside. The defendant also told the victim that he had a gun that he would use if she screamed, and the victim saw what she thought was a gun on his person. See *State* v. *Paolella,* 211 Conn. 672, 679, 561 A.2d 111 (1989); *State* v. *Bell,* 188 Conn. 406, 416, 450 A.2d 356 (1982). When the victim left her bed, where the defendant previously had commanded her to undress and remain, he roughly grabbed her breasts and demanded that she return to the bed and lie down. See *State* v. *Paolella,* supra; *State* v. *Bell,* supra; *State* v. *Lee,* 177 Conn. 335, 344, 417 A.2d 354 (1979). The victim, in order to survive, complied with the defendant's demands. See *State* v. *Bell,* supra. In view of this evidence, we cannot say that there was an insufficient factual basis for the jury to conclude rationally that the defendant possessed the requisite intent to abduct the victim under §§ 53a-91 (2) and 53a-92 (a) (2) (A).

IV

The defendant next claims that § 53a-92 (a) (2) (A) is unconstitutionally vague as applied to the facts supporting his conviction of first degree kidnapping.[11] As previously noted, the conviction arose from the events that took place at the victim's apartment. The defendant asserts that the impermissibly vague aspect of § 53a-92 (a) (2) (A) is its "restraint" element, particularly, that portion of the statutory definition of "restrain" applicable under the statute where a defendant is alleged, as in the present case, to have moved his victim "from one place to another." General Statutes § 53a-91 (1). According to the defendant, applying the "movement" requirement to the facts pertaining to the apartment kidnapping, which he characterizes as presenting "a scenario of truly minimal movement, such as from the desk to the bed within a bedroom," produces an absurd and unconscionable result. We do not agree.

"Due process requires that laws 'give the person of ordinary intelligence a reasonable opportunity to know what is prohibited' and 'provide explicit standards for those who apply them' in order to prevent the risk of arbitrary and discriminatory enforcement." *Connecticut Building Wrecking Co.* v. *Carothers,* 218 Conn. 580, 591, 590 A.2d 447 (1991). In a case such as this, where first amendment freedoms are not implicated, "a claim that a statute is void for vagueness is determined by its applicability to the particular facts presented." *State* v. *Smith,* 210 Conn. 132, 144, 554 A.2d

---

[11] Notwithstanding the defendant's failure to preserve this claim at trial, we review the claim "because it implicates the fundamental due process right to fair warning and the record is adequate to facilitate review." *State* v. *Schriver,* 207 Conn. 456, 459, 542 A.2d 686 (1988); see *State* v. *Jones,* 215 Conn. 173, 179, 575 A.2d 216 (1990).

713 (1989). The fact that " 'a statutory provision may be of questionable applicability in speculative situations is usually immaterial if the challenged provision applies to the conduct of the defendant in the case at issue.' " Id.

While we recognize that there are conceivable "factual situations in which charging a defendant with kidnapping based upon the most minuscule movement would result in an 'absurd and unconscionable' result"; *State* v. *Jones,* 215 Conn. 173, 180, 575 A.2d 216 (1990); we do not find this case to present such a situation. Contrary to the defendant's proposed "desk to bed" scenario, the facts of this case demonstrate that the defendant moved the victim between various locations within her apartment. See *State* v. *Lee,* supra (defendant moved victim "from stairway back to his bedroom"). Prior to the "desk to bed" movement, the defendant, after forcing his way into the victim's apartment, moved the victim from the entryway of her apartment through the living room and down the hallway to the desk in her bedroom. The "desk to bed" movement identified by the defendant then occurred. Thereafter, the defendant moved the victim, by ordering her to move, from the bed to her bureau. The defendant then moved the victim from the bureau back to her bed. The totality of these movements formed the basis of the state's charge, and the defendant's conviction, of kidnapping with the intent to "violate or abuse [the victim] sexually" at her apartment. General Statutes § 53a-92 (a) (2) (A).

Upon these facts, it can hardly be disputed that the defendant moved the victim from one place to another, the conduct proscribed by §§ 53a-91 (1) and 53a-92 (a) (2) (A). Section 53a-92 (a) (2) (A), therefore, is not unconstitutionally vague as applied to the defendant's conduct. The defendant cannot make it so by

presenting us with a factual scenario that does not accurately reflect what transpired in connection with the apartment kidnapping.[12]

## V

The defendant next challenges the court's decision to shackle him at trial. On the second day of trial, the court informed the defendant out of the presence of the jury that he would be restrained in leg irons for the remainder of the trial. The reason for the restraints, the court stated, was that it had "the right to determine the need for physical restraints based upon reliable information received from law enforcement officers or correctional officers." The court also explained that the courthouse sheriffs had "received information to the effect" that, with the court's approval, shackles should be employed. In response to the defendant's demand "to know where the sheriff's department got that information from," the court stated that it would "not divulge anything further," and that it did not know the source of the sheriffs' information. The court then refused the defendant's request to know "the reason for all this," and his request for removal of the restraints. At the court's direction, however, both counsel tables were covered with brown paper to prevent the jury from observing the defendant's restraints and to eliminate any suspicion that might occur if only defense counsel's table were covered. Thereafter, the court excused the jury while the defendant was brought to and from the courtroom in restraints. The court permitted the defendant to testify unrestrained.

The defendant asserts that the record does not establish the existence of a reasonable necessity to support

---

[12] Since the facts of the present case do not solely involve movement of the victim from the desk to her bed, we do not consider whether a kidnapping conviction based on movement of this nature "would result in an 'absurd and unconscionable' result." *State* v. *Jones,* 215 Conn. 173, 180, 575 A.2d 216 (1990).

the court's decision to shackle him. This deficiency in the record, the defendant claims, together with the prejudice allegedly resulting from the use of the shackles, deprived him of a fair trial. Although we find the record inadequate to demonstrate a reasonable necessity for shackling the defendant, we agree with the state that the precautionary measures taken by the court so minimized the potential prejudicial effect of the shackles that any impropriety in the court's decision to employ them was harmless. *State* v. *Woolcock,* 201 Conn. 605, 615, 518 A.2d 1377 (1986).

" 'As a general proposition, a criminal defendant has the right to appear in court free from physical restraints. . . . Grounded in the common law, this right evolved in order to preserve the presumption favoring a criminal defendant's innocence, while eliminating any detrimental effects to the defendant that could result if he were physically restrained in the courtroom.' (Citations omitted.) *State* v. *Williams,* 195 Conn. 1, 5–6, 485 A.2d 570 (1985). 'The presumption of innocence, although not articulated in the Constitution, is a basic component of a fair trial under our system of criminal justice.' *Estelle* v. *Williams,* 425 U.S. 501, 503, 96 S. Ct. 1691, 48 L. Ed. 2d 126, reh. denied, 426 U.S. 954, 96 S. Ct. 3182, 49 L. Ed. 2d 1194 (1976)." *Sekou* v. *Warden,* 216 Conn. 678, 691, 583 A.2d 1277 (1990). Nonetheless, a defendant's right to appear before the jury unfettered is not absolute. *State* v. *Woolcock,* supra, 613. A trial court may employ a "reasonable means of restraint" upon a defendant if, exercising its broad discretion in such matters, the court finds that restraints are "reasonably necessary" under the circumstances. Practice Book § 892;[13] see *Sekou* v. *Warden,* supra, 692.

---

[13] "[Practice Book] Sec. 892. ——REMOVAL AND RESTRAINT

"Upon the direction of the judicial authority, a defendant may be removed from the courtroom during his trial when his conduct has become so disruptive that the trial court cannot proceed in an orderly manner. Reasonable

In reviewing a shackling claim, our task is to determine whether the court's decision to employ restraints constituted a clear abuse of discretion. *Sekou* v. *Warden,* supra. While appellate review is greatly aided when a court develops the record by conducting an evidentiary hearing concerning the necessity for restraints, "such a hearing is not mandatory." Id. A record in some fashion disclosing the justification for using restraints, however, is essential to meaningful appellate review of a shackling claim. Id.; *State* v. *Woolcock,* supra, 614; *State* v. *Williams,* supra, 8. "This is particularly so because of the potential for prejudice in the use of shackles." *State* v. *Woolcock,* supra. Accordingly, a trial court must ensure that its reasons for ordering the use of restraints "are detailed in the record." *Sekou* v. *Warden,* supra.

In the present case, the record discloses that the court restrained the defendant because it had received from the sheriffs "reliable" information "to the effect" that such a course of action should be taken. That information, alone, may well have provided the court with a sound basis for determining that shackles were reasonably necessary. See *State* v. *Williams,* supra, 7. In view of the fact that the law enforcement personnel at our courthouses are responsible for and possess superior experience in matters of courtroom security, it is practicable for a court to " 'rely heavily' " upon the advice of such personnel in determining whether a criminal defendant should be restrained. *Sekou* v. *Warden,* supra, 693; see *State* v. *Williams,* supra, 9; see also

means of restraint may be employed if the judicial authority finds such restraint reasonably necessary to maintain order. If the judicial authority orders such restraint, he shall enter into the record of the case the reasons therefor. Whenever physical restraint of a defendant occurs in the presence of jurors trying the case, or whenever the defendant is removed, the judicial authority shall instruct the jurors that such restraint or removal is not to be considered in assessing the evidence or in determining guilt or innocence."

*United States* v. *Samuel,* 431 F.2d 610, 615 (4th Cir. 1970), cert. denied, 401 U.S. 946, 91 S. Ct. 964, 28 L. Ed. 2d 229 (1971). A court may also consider other information not in evidence, including official records, information supplied by correctional officers and attorneys, and "facts generally known within the limits of its jurisdiction." *State* v. *Woolcock,* supra, 616; see *State* v. *Williams,* supra. "Such information or knowledge, however, should be placed on the record outside the presence of the jury and the defendant given the opportunity to respond to that information." *State* v. *Woolcock,* supra.

By failing to divulge the information prompting its decision to restrain the defendant, the court not only denied the defendant a meaningful opportunity to respond to that information, but also rendered the record inadequate for our review of its decision to restrain him. The record, moreover, does not otherwise evince the requisite reasonable necessity for restraints. Compare *Sekou* v. *Warden,* supra, 692. Nonetheless, however improper the court's failure to specify the information on which it relied, there is no evidence in the record that the jury saw or otherwise knew of the defendant's restraints.[14] See *State* v. *Woolcock,* supra. The court took particular pains to conceal the defendant's shackles and to neutralize possible suspicion by ensuring that both counsel tables were covered with paper, excusing the jury while the defendant was brought to and from the courtroom, and permitting the defendant to testify unrestrained. See *Sekou* v. *Warden,* supra, 693–94; *State* v. *Williams,* supra, 9–10. Furthermore, the defendant did not claim at trial, nor is there any evidence to suggest, that the shackles

---

[14] Although defense counsel claimed at trial that the defendant's restraints were visible from the jury box, he did not create a record to substantiate that claim by making an appropriate offer of proof. See *State* v. *Williams,* 195 Conn. 1, 10, 485 A.2d 570 (1985).

inhibited his ability to communicate with his attorney. See *State* v. *Woolcock,* supra.

In order for a criminal defendant to enjoy the maximum benefit of the presumption of innocence, our courts should make every reasonable effort to present the defendant before the jury in a manner that does not suggest, expressly or impliedly, that he or she is a dangerous character whose guilt is a foregone conclusion. *State* v. *Woolcock,* supra, 612–13; see *Harrell* v. *Israel,* 672 F.2d 632, 635 (7th Cir. 1982). There is no doubt that " 'the sight of shackles and gags might have a significant effect on the jury's feelings about the defendant.' " *Holbrook* v. *Flynn,* 475 U.S. 560, 568, 106 S. Ct. 1340, 89 L. Ed. 2d 525 (1986). The negative connotations of restraints, nevertheless, are without significance unless the fact of the restraints comes to the attention of the jury. As the present record is devoid of competent evidence that the jury was aware of the defendant's shackles at any time during his trial, it is clear beyond a reasonable doubt that the presumption of innocence was not abridged by the court's decision to shackle him. See *State* v. *Woolcock,* supra, 615–16; see also *State* v. *McMurtrey,* 136 Ariz. 93, 98, 664 P.2d 637 (1983), and authorities cited therein. Rather than depriving the defendant of a fair trial, therefore, any impropriety in that decision was, under the circumstances, harmless. See *State* v. *Woolcock,* supra, 615.

## VI

The defendant next claims that the prosecutor's misconduct, while cross-examining him at trial and during the state's rebuttal argument, violated his federal and state constitutional rights to a fair trial, to an impartial jury and to confront the witnesses against him.[15] Conceding his failure to preserve this claim, the

---

[15] The defendant asserts that the prosecutor improperly expressed personal opinions, vilified the defendant's character, and misdirected the jury

defendant, relying upon *State* v. *Williams,* 204 Conn. 523, 529 A.2d 653 (1987), seeks review of the claim under *State* v. *Evans,* 165 Conn. 61, 327 A.2d 576 (1973), and *State* v. *Golding,* 213 Conn. 233, 567 A.2d 823 (1989). The defendant alternatively asserts that the claim is reviewable as plain error under Practice Book § 4185.[16] We are not persuaded.

In *State* v. *Williams,* supra, 204 Conn. 536, we found an unpreserved prosecutorial misconduct claim "reviewable under the second exceptional circumstance of *State* v. *Evans,* supra, because the defendant [had] raised a claim, adequately supported by the record, that he clearly [had] been deprived of a fundamental constitutional right and a fair trial." We pointed out, however, that "[i]n the cases in which we have denied *Evans* review, the claimed misconduct consisted of isolated and brief episodes, and did not reveal a pattern of conduct repeated throughout the trial. Moreover, the misconduct was not blatantly egregious." Id., 537. Our careful review of the record in this case reveals that the prosecutor's challenged conduct, while improper in certain instances, was "unrepresentative of a pattern of conduct repeated throughout the trial." *State* v. *Castonguay,* 218 Conn. 486, 507, 590 A.2d 901 (1991). Similarly, we do not find, as is necessary to merit plain error review, that those limited instances of improper conduct so pervaded the defendant's trial as to have impaired the effectiveness or integrity of the judicial process. *State* v. *Foreshaw,* 214 Conn. 540, 547, 572

by insinuating that the resolution of the issues at trial turned upon who, as between the defendant and the state's witnesses, had told the truth.

[16] The defendant also contends that under *State* v. *Fullwood,* 194 Conn. 573, 584, 484 A.2d 435 (1984), an unpreserved prosecutorial misconduct claim is reviewable if the prosecutor deliberately disregarded "established rules of fair play." Simply stated, *Fullwood,* which involved a preserved prosecutorial misconduct claim, provides no authority for this contention.

A.2d 1006 (1990). We, therefore, decline to review the defendant's unpreserved prosecutorial misconduct claim.

## VII

Finally, the defendant challenges three omissions in the court's instructions to the jury. He argues that the court deprived him of due process by failing to give adequate instructions on: (1) the essential element of intent permanently to deprive another of property as required for conviction of the crime of robbery in violation of § 53a-134 (a) (4); (2) the essential element of compulsion required for conviction of the crime of sexual assault in violation of § 53a-70 (a); and (3) the statutory definition of "intentionally" in General Statutes § 53a-3 (11) with respect to the essential element of intent required for conviction of several of the charged crimes.[17] In light of his failure to preserve any of these claims by submitting requests to charge on the matters now claimed improperly omitted or taking appropriate exceptions at the close of the court's instructions; see Practice Book § 852; the defendant seeks review of the claims under State v. Golding, supra.

We agree with the defendant that "the record is adequate to review" all of his claims; id., 239; and thus he has satisfied the first Golding condition. We also

[17] The defendant also claims for the first time on appeal that he was deprived of a fair trial by the court's failure to deliver a curative instruction with regard to the prosecutor's statement during closing argument that any "no" answer given by a witness could not be treated as evidence. Unlike the defendant's other unpreserved claims, this claim is of evidentiary, rather than constitutional, significance. See, e.g., State v. Smith, 219 Conn. 160, 165–66, 592 A.2d 382 (1991). We, therefore, decline to review the claim because the defendant has not satisfied the second condition of State v. Golding, 213 Conn. 233, 239–40, 567 A.2d 823 (1989).

As for the defendant's unpreserved claim that the court's instructions improperly erased the distinction between restraint and abduction under General Statutes § 53a-91 (1) and (2), we do not reach its merits due to inadequate briefing.

agree that each of the defendant's claims, in that they pertain to essential elements of the crimes charged, are "of constitutional magnitude alleging the violation of a fundamental right" in satisfaction of the second *Golding* condition. Id.; see *State* v. *Allen,* 216 Conn. 367, 383, 579 A.2d 1066 (1990). Nonetheless, after a painstaking review of the court's charge as a whole, we conclude that none of the challenged omissions in the court's instructions could possibly have misled the jury. See *State* v. *Anderson,* 212 Conn. 31, 38, 561 A.2d 897 (1989). The defendant has therefore failed to satisfy the third *Golding* condition by demonstrating that any of the alleged constitutional violations "clearly exists and clearly deprived the defendant of a fair trial . . . ." *State* v. *Golding,* supra, 240. Necessarily, then, all of the defendant's claims fail. Id.

The judgment is affirmed.

In this opinion the other justices concurred.