STATE OF CONNECTICUT *v.* PAOLINO
SANSEVERINO
(AC 25793)

DiPentima, Gruendel and Berdon, Js.

Argued May 23—officially released October 24, 2006

*Jon L. Schoenhorn*, with whom, on the brief, was *Jennifer L. Bourn*, for the appellant (defendant).

*Leon F. Dalbec, Jr.*, senior assistant state's attorney, with whom, on the brief, were *Scott J. Murphy*, state's attorney, and *Paul N. Rotiroti*, assistant state's attorney, for the appellee (state).

*Opinion*

BERDON, J. The defendant, Paolino Sanseverino, appeals from the judgment of conviction, rendered after a jury trial, of sexual assault in the first degree in violation of General Statutes § 53a-70 (a) (1), in which C[1] was the victim, attempt to commit sexual assault in the first degree in violation of General Statutes §§ 53a-49 (a) (2) and 53a-70 (a) (1), in which C was the victim, kidnapping in the first degree in violation of General

---

[1] In accordance with our policy of protecting the privacy interests of the victims of sexual abuse, we decline to identify the victims or others through whom the victims' identities may be ascertained. See General Statutes § 54-86e.

Statutes § 53a-92 (a) (2) (A), in which G was the victim, and sexual assault in the first degree in violation of General Statutes § 53a-70 (a) (1), in which G was the victim. On appeal, the defendant claims that the court improperly (1) denied his motion to sever the two cases against him, thereby depriving him of a fair trial, and (2) rendered judgment of conviction of kidnapping in the first degree because § 53a-92 (a) (2) (A) is unconstitutionally vague as applied to his conduct.[2]

We agree with the defendant that the court improperly denied the motion to sever the two cases against him, depriving him of his right to a fair trial. We therefore reverse the judgment of the trial court and order new, separate trials for the two cases. We also address the defendant's claim that the kidnapping statute is unconstitutionally vague as applied to his conduct because the issue is likely to arise in the new trial involving G.

The jury reasonably could have found the following facts. In June or July, 1998, the defendant, the owner of Uncle's Bakery in Newington, hired C to work in the bakery. C worked at the bakery for one week. During the time she was there, her hours were from 7 a.m. to 2 or 3 p.m. One day, toward the end of her shift, while she was alone with the defendant, the defendant asked C to take a box into the back room. The defendant followed C into the back room, grabbed her by her shoulders and pushed her against a wall and a metal shelving unit. She could not move because the defendant had one arm and his upper body pressed against her. The defendant pulled her shirt out of her pants, put his hand under her shirt and touched her breasts. She tried to push him away and told him three or four

---

[2] The defendant also claims that the court improperly admitted the rebuttal character testimony of his former wife. We do not address that claim, however, because we reverse the judgment and order new trials, and we cannot say that the claim is likely to arise in either of the new trials.

times to stop, but he told her that "he could do whatever he wanted to [her] because he had friends in the Newington police department, and it would be [her] word against his. Nobody would believe [her]." He then unbuttoned her jeans, pulled them down and digitally penetrated her vagina. He unbuttoned his pants and pulled out his penis. He turned C around and held her down by the back of the neck, pinning her with her head between the shelving unit and the wall. He tried to insert his penis into her vagina, but because she kept moving around, he did not successfully penetrate her, although she did feel the pressure of his trying to insert himself.

At that point, the buzzer rang at the front door, indicating that a customer had entered the store. The defendant turned C around, put his hand over her mouth, pushed her against the wall and told her to stay there and to be quiet. When the defendant left to assist the customer, C ran out of the bakery and went home. She never returned to the bakery. At home, C went into the bathroom, took off her clothes and showered. She later burned her clothing. She testified that her initial intention was to call the police but that when she got home, her boyfriend had three other people with him, and she did not want them to know, so she did not tell anyone or call the police at that time. She did not tell anyone what had happened to her until "a couple of months later." C testified that after what happened, she was angry always, and if she was not working, she was sleeping. She said that she would not talk to anybody or let anybody touch her, and she would not let anybody be around her. Her boyfriend's mother, with whom C was residing, eventually asked her about her behavior and mood, and C "finally broke down and told her what had happened at the bakery."

On November 8, 1998, C contacted Peter Lavery, an officer with the Newington police department, to report

that she had been sexually assaulted sometime in June or July, 1998, by the defendant at Uncle's Bakery. She gave a sworn statement of what had occurred. Later that same day, she contacted Lavery and said that she did not want to press charges against the defendant and did not want to go through any further investigation of the case because it would be too stressful for her to go to court and go through the court proceedings. In August, 1999, however, after being informed that a second rape victim, G, had come forward, C agreed to reinstate her case against the defendant. C and G did not know each other.

In the fall of 1998, G became a regular customer at Uncle's Bakery. In the spring of 1999, she approached the defendant about working at the bakery and was hired to work from 5 a.m. to 7:30 a.m. In May, 1999, as G started her shift at 5 a.m., she went into the back room of the bakery to get her apron. The defendant followed her in and grabbed her. She told him to "get away and stop," to which the defendant replied, "[you] know you want it, so stop." The defendant grabbed G's arms, pushed her against the wall, pinned her arms over her head with his arm, and pressed his body against hers so she could not move. She twice yelled at him to stop, but he did not. She testified that she became afraid and that she froze. While still keeping her pinned, he pulled her pants down, then pulled his pants down. He inserted his penis inside her vagina and then, prior to climaxing, pulled out and ejaculated on the floor. The defendant let G go, and she went into the bathroom, locked herself in and did not come out again until she heard another person enter the bakery. G then came out of the bathroom, waited until her shift was over and went home. She threw away her clothes. She did not talk to anybody about what had happened because, she testified, she felt ashamed, dirty, cheap and scared because the defendant had threatened her. She testified

that he had told her that "he was with the family, the mob and that if [she] ever said anything . . . he would take care of [her] and [her] family." G continued to work at the bakery for about one week because she was afraid of the defendant. After one week, she called in and quit because she "could [not] stand to see [the defendant] anymore." At some point, G told her former husband and her sister what had happened. She was advised not to say or do anything "because it would cause a scandal" and because her sister and her sister's husband "were in the process of buying the business from the defendant." She testified that if she had said anything, "they might have lost the business." In July, 1999, however, G reported the sexual assault when she found out that the defendant was "smearing [her] name, saying that [she] was doing sexual favors for other men." This made her angry and determined that "he's not going to get away with this." On July 30, 1999, G reported the sexual assault to Kenneth O'Brien, an officer with the Newington police department, and signed a sworn statement. The defendant subsequently was charged in connection with both incidents.

After a nine day trial, the jury found the defendant guilty on all counts. The defendant was sentenced to a total effective term of forty years incarceration. This appeal followed. Additional facts will be set forth as needed.

I

The defendant first claims that the court improperly denied his motion to sever the two cases against him, thereby depriving him of a fair trial. Specifically, he argues that the two cases did not involve discrete, easily distinguishable factual scenarios. The defendant also argues that he suffered substantial prejudice as a result of the consolidation and that the prejudice was not

cured by the court's inadequate instructions to the jury. We agree.

On July 18, 2002, the defendant filed a motion for severance of offenses and for separate trials, which was denied. "In deciding whether to sever informations joined for trial, the trial court enjoys broad discretion, which, in the absence of manifest abuse, an appellate court may not disturb. . . . The defendant bears a heavy burden of showing that the denial of severance resulted in substantial injustice, and that any resulting prejudice was beyond the curative power of the court's instructions. . . . [B]ecause joinder foster[s] economy and expedition of judicial administration . . . we consistently have recognized a clear presumption in favor of joinder and against severance . . . and, therefore, absent an abuse of discretion, we will not second guess the considered judgment of the trial court as to joinder or severance of two or more charges. . . .

"A court's discretion regarding joinder, however, is not unfettered. The determination to try a defendant jointly on charges arising from separate cases may only be reached if consistent with the defendant's right to a fair trial." (Citations omitted; internal quotation marks omitted.) *State* v. *Bell*, 93 Conn. App. 650, 654–55, 891 A.2d 9, cert. denied, 277 Conn. 933, 896 A.2d 101 (2006). In *State* v. *Boscarino*, 204 Conn. 714, 529 A.2d 1260 (1987), our Supreme Court identified several factors that a trial court should consider in making its determination of whether severance is required. Those factors are (1) whether the charges involve discrete, easily distinguishable factual scenarios, (2) whether the crimes were of a violent nature or concerned brutal or shocking conduct on the defendant's part, and (3) the duration and complexity of the trial. Id., 722–23. "[I]f any or all of these factors were present, a reviewing court would have to decide whether the trial court's jury instructions cured any prejudice that might have occurred." *State*

v. *Herring*, 210 Conn. 78, 95, 554 A.2d 686, cert. denied, 492 U.S. 912, 109 S. Ct. 3230, 106 L. Ed. 2d 579 (1989).

Whether there should be severance of multiple counts in a case such as this must also be viewed through the lens of the recent ruling of our Supreme Court in which it "recognized that the crime of sexual assault [is] violent in nature, irrespective of whether it is accompanied by physical violence. Short of homicide, [sexual assault] is the ultimate violation of self. It is also a violent crime because it normally involves force, or the threat of force or intimidation, to overcome the will and the capacity of the victim to resist. [Although sexual assault] is very often accompanied by physical injury to the [victim] . . . [it] can also inflict mental and psychological damage." (Internal quotation marks omitted.) *State* v. *Ellis*, 270 Conn. 337, 377, 852 A.2d 676 (2004).

We agree with the defendant that the two cases for which he was jointly tried did not involve discrete, easily distinguishable factual scenarios. Both cases involved alleged sexual assaults that occurred in the back room of the bakery owned by the defendant. Both victims were employees of the defendant and were alone with the defendant in his bakery during their shifts at the time of the assaults. In both, the victims walked into the back room of the bakery where the defendant grabbed the victims, pushed them against the wall, kept them from moving by pressing his upper body against theirs and holding down their arms with his arm, pulled down their pants, pulled down his pants and either attempted or had sexual intercourse. Both victims clearly told the defendant more than once to stop, but he did not and continued to restrain them. The defendant also threatened both victims by referring to the powerful connections he had and what would happen to the victims if they endeavored to tell anyone about the assaults. The similarities in both cases were "significant enough to impair the defendant's right to

the jury's fair and independent consideration of the evidence in each case." *State* v. *Boscarino,* supra, 204 Conn. 723.

"[I]mproper joinder may expose a defendant to potential prejudice for three reasons: First, when several charges have been made against the defendant, the jury may consider that a person charged with doing so many things is a bad [person] who must have done something, and may cumulate evidence against him . . . . Second, the jury may have used the evidence of one case to convict the defendant in another case even though that evidence would have been inadmissible at a separate trial. . . . [Third] joinder of cases that are factually similar but legally unconnected . . . present[s] the . . . danger that a defendant will be subjected to the omnipresent risk . . . that although so much [of the evidence] as would be admissible upon any one of the charges might not [persuade the jury] of the accused's guilt, the sum of it will convince them as to all." (Internal quotation marks omitted.) *State* v. *Ellis,* supra, 270 Conn. 374–75. We thus conclude that the defendant suffered substantial prejudice from the consolidation of the two cases against him.[3]

The state, however, argues that any prejudice that potentially arose from the joinder of the cases was

---

[3] The state argues that because the evidence of either sexual assault would have been admissible in the separate trial of the other to prove a common scheme or plan and the intent of the defendant, separate trials would not have provided the defendant with any significant benefit. The defendant counters that while certain facts relating to one incident may have been admissible in a trial on the other incident to prove a common scheme or plan and intent, the jury could not have considered the facts of one case as evidence of guilt in the other case. We agree with the defendant. Evidence of either crime may have been admissible in a separate trial concerning the other incident, but the evidence would have been admissible only to prove intent or common scheme or plan. See *State* v. *Malon,* 96 Conn. App. 59, 70, 898 A.2d 843 (2006). In addition, in this case, "[j]oinder gave the state the opportunity to present the jury with the intimate details of each of these offenses, an opportunity that [might] have been unavailable if the cases had been tried separately." *State* v. *Boscarino,* supra, 204 Conn. 723.

cured by the court's instruction to the jury to consider separately the evidence in each case.[4] We cannot agree.

In *State* v. *Ellis*, supra, 270 Conn. 379, our Supreme Court, in holding that the court's instruction failed to mitigate the prejudice to the defendant arising from the joinder of cases against him, took the following into consideration. The trial court had refrained from instructing the jury that it could not consider the evidence in one victim's case in determining the defendant's guilt in the other cases. Id. Instead, the court improperly instructed the jury that it could consider the evidence in the case of one victim to convict the defendant in the case involving another victim. Id. Although it repeatedly instructed the jury to consider the multiple counts separately, the court never advised the jury to distinguish the charges relating to one victim from the charges relating to the other victims. Id.

Similarly, in this case, the court merely instructed the jury as to multiple charges generally. The court

[1] Before the start of evidence, the court, in its preliminary charge to the jury, instructed as follows: "Multiple charges: You will note that the accused is charged in four counts. This is legal language for saying that the accused is charged with committing four separate crimes or offenses. Each count alleges a separate crime, joined for convenience of the trial, in one formal charge or information. It will be your duty to consider each charge or count separately. When you return to the courtroom, you will be asked whether or not the defendant is guilty as charged or not guilty in each count, and you will render your verdicts accordingly."

In its final charge, the court instructed the jury on the elements of each of the four counts, identifying the alleged victim of each count, but with a focus on the count and not the victim. The court then reiterated the instruction in its preliminary charge: "The accused is charged in four counts. You will have noted that each charge against the accused is set forth on the substitute information in a separate paragraph. That is legal language for saying that the accused is charged with committing four separate offenses or crimes. Each count alleges a separate crime joined for convenience of the trial in one formal charge or information. It will be your duty to consider each charge or count separately. When you return to the courtroom, you will be asked whether or not the accused is guilty as charged in each of the counts, and you will render your verdicts accordingly."

instructed the jury that the defendant was charged with committing four separate offenses or crimes and that the jury must consider each of the counts individually. This was inadequate to cure the substantial prejudice suffered by the defendant. The court failed to instruct the jury that it could not use or consider the evidence from one victim's case in determining whether to convict on the other case. The court moreover did not clearly advise the jury to distinguish the charges relating to C from the charges relating to G. Compare *State* v. *David P.*, 70 Conn. App. 462, 470 n.10, 800 A.2d 541 (jury instruction adequate to cure prejudice where court instructed that jury was to consider evidence for each case separately and went over different charges involved according to case and victim), cert. denied, 262 Conn. 907, 810 A.2d 275 (2002).

Moreover, unlike *State* v. *Rodriguez*, 91 Conn. App. 112, 116–21, 881 A.2d 371, cert. denied, 276 Conn. 909, 886 A.2d 423 (2005), in which we held that the jury instructions were sufficient to cure any prejudice that the defendant might have suffered, the court in this case did not remind the jury repeatedly throughout the trial to consider the two cases separately and not to allow evidence of one case to influence or to be used in its consideration of the other case unless the court instructed it that particular evidence applied to both cases. Furthermore, in *Rodriguez*, "[the court] repeated those instructions numerous times during the trial and specified the particular cases for which the jury could consider each witness' testimony. At the conclusion of the evidence, [the court] reiterated [its] earlier instructions." Id., 116–17. The court in this case did not employ the same degree of care.

We therefore conclude that the court's instruction did not adequately cure the prejudice that arose from the joinder. Our conclusion requires that the defendant be granted new, separate trials.

## II

We next address the defendant's claim that the court improperly rendered judgment against him for kidnapping in the first degree because § 53a-92 (a) (2) (A) is unconstitutionally vague as applied to his conduct. He argues that the restraint on G lasted no more than a minuscule amount of time and was no longer than necessary for the defendant to complete the sexual assault, thus rendering application of the kidnapping statute to the circumstances unconstitutionally vague. We are not persuaded.

"We have stated that [a]s a general rule, when a statute is attacked as void for vagueness, its validity is determined by its application to the particular facts at issue. . . . In challenging the constitutionality of a statute, the defendant bears the heavy burden of establishing beyond a reasonable doubt that the statute is in fact unconstitutional. . . . On appeal, a court will indulge in every presumption in favor of a statute's constitutionality. . . . If a penal statute provides fair warning, it will survive a vagueness attack. . . .

"If the meaning of a statute can be fairly ascertained a statute will not be void for vagueness since [m]any statutes will have some inherent vagueness. . . . This court must also look to see whether a person of ordinary intelligence would reasonably know what acts are permitted or prohibited by the use of his common sense and ordinary understanding." (Internal quotation marks omitted.) *State* v. *DeJesus*, 91 Conn. App. 47, 84–85, 880 A.2d 910 (2005), cert. granted on other grounds, 279 Conn. 912, 903 A.2d 658 (2006).

With these principles in mind, we turn to the specifics of this case. A person is guilty of kidnapping in the first degree, pursuant to § 53a-92 (a), if he "abducts another person and . . . (2) . . . restrains the person abducted with intent to (A) . . . violate or abuse him

sexually . . . ." General Statutes § 53a-91 (2) defines "abduct" as "restrain[ing] a person with intent to prevent his liberation by either (A) secreting or holding him in a place where he is not likely to be found, or (B) using or threatening to use physical force or intimidation." The term "restrain" is also defined in § 53a-91 (1) as "restrict[ing] a person's movements intentionally and unlawfully in such a manner as to interfere substantially with his liberty by moving him from one place to another, or by confining him either in the place where the restriction commences or in a place to which he has been moved, without consent. . . ."

"[A]ll that is required under the statute is that the defendant have abducted the victim . . . . Under the aforementioned definitions, the abduction requirement is satisfied when the defendant restrains the victim with the intent to prevent her liberation through the use of physical force. Further, the victim is restrained when the defendant . . . moves her from one place to another or restricts her movement by confining her in the place where the restriction commenced. Nowhere in this language is there a requirement of movement on the part of the victim. Rather, we read the language of the statute as allowing the restriction of movement alone to serve as the basis for kidnapping. Therefore, the relevant inquiry under our kidnapping statute is whether any movement, or restriction of movement, was accomplished with the intent to prevent the victim's liberation." (Citation omitted.) *State* v. *Luurtsema*, 262 Conn. 179, 201–202, 811 A.2d 223 (2002).

In this case, the defendant grabbed G in the back room of the bakery he owned. Despite G's pleas for the defendant "to get away and stop," the defendant continued to restrain G. The defendant pushed her against the wall, held her hands above her head and pressed his body against her so that she could not move. G twice told the defendant to stop, but he did not. The

defendant instead pulled her pants down, then pulled his pants down and inserted his penis into her vagina. Only when he had pulled out and ejaculated on the floor did the defendant let G go.

We find these facts similar to the 2001 conduct of the defendant in *State* v. *DeJesus*, supra, 91 Conn. App. 95–96, in which "[a]fter enticing the victim into the isolated room, the defendant forced her to sit in a chair, and proceeded to position his body so as to restrain her effectively and to prohibit her from leaving. The defendant essentially straddled the chair and locked his hands behind the victim's head and forced her to perform oral sex on him for several minutes. While maintaining his position, the defendant then proceeded to penetrate the victim's vagina with his finger." We stated in that case that "[s]uch restraint was neither minor nor an essential part of the crime of sexual assault in the first degree. The defendant's conviction of kidnapping in the first degree . . . therefore, was not based on an unconstitutionally vague statute as applied to his actions." Id., 96.

We conclude that this case differs significantly from the following factual scenario, which we held would not have put the defendant on notice that his conduct would violate the kidnapping statute. In *DeJesus*, with respect to a 2000 incident separate from the 2001 incident, "[t]he victim was told to enter an isolated room with the defendant. . . . The defendant removed the victim's pants and underwear. The defendant penetrated the victim with his penis, and she immediately told him that it hurt, got up and left the room. . . . [I]t is unclear whether the defendant restrained the victim at any time because the evidence demonstrated that she was able to leave the room without being stopped." Id.

We distinguished the facts of the 2000 incident in *DeJesus* from other cases in which the same claim was

raised and rejected. "In the other cases that have addressed this claim, some type of unlawful movement or restraint of the victim preceded the commission of the sexual assault. For example, in [*State* v. *Troupe*, 237 Conn. 284, 289, 677 A.2d 917 (1996)], the victim was held against her will in the defendant's apartment, even after she had attempted to break free. . . . Similarly, in [*State* v. *Tweedy*, 219 Conn. 489, 503, 594 A.2d 906 (1991)], the defendant blocked the victim's escape from her own apartment and forced her to remain in certain rooms while he committed other criminal acts. . . . Likewise, the defendants in [*State* v. *Jones*, 215 Conn. 173, 175, 575 A.2d 216 (1990)] and [*State* v. *Hill*, 58 Conn. App. 797, 799, 755 A.2d 919, cert. denied, 254 Conn. 936, 761 A.2d 763 (2000)] forced their victims off the street so that they could facilitate further criminal activity. None of those circumstances appears in the second assault in 2000 . . . . The common factor in all of those cases . . . is the occurrence of some act by the defendant, perhaps minuscule, of restraint or movement of the victim that was not essential to the underlying assault." (Citations omitted; internal quotation marks omitted.) *State* v. *DeJesus*, supra, 91 Conn. App. 96–97.

We also distinguish the facts of *State* v. *Winot*, 95 Conn. App. 332, 897 A.2d 115, cert. granted, 279 Conn. 905, 901 A.2d 1229 (2006), from the case at hand. In *Winot*, the defendant forcibly took a twelve year old girl by the arm and attempted to pull her toward his parked vehicle. Id., 336. We stated in *Winot* that "the evidence reveal[ed] that the only restraint imposed on the victim was the defendant's forcibly taking the victim's arm and pulling on it for a few seconds. We conclude, therefore, that the evidence of the movement and confinement in this case falls into the realm of the 'minuscule' movement or duration of confinement. To hold that the defendant was put on notice that this

conduct would violate the kidnapping statute . . . would be an absurd and unconscionable result." Id., 343.

Here, it was clear that the defendant restrained G prior to and during his sexual assault of her. The evidence shows that he pushed her against the wall and pressed his body against hers to prevent her from moving. She was unable to leave. The amount of restraint of movement on G was not minuscule. Moreover, the amount of time that the victim was restrained is not relevant, the relevant inquiry being whether any movement, or restriction of movement, was accomplished with the intent to prevent the victim's liberation. We conclude that such restriction was accomplished in this case. Accordingly, we conclude that the kidnapping statute is not unconstitutionality vague as applied to the defendant's conduct.

The judgment is reversed and the case is remanded for a new trial in each case.

In this opinion the other judges concurred.